STATE OF IOWA, Appellee, v. IDA E. MEYER, Appellant.

CRIMINAL LAW: Trial—Change of Venue—Erroneous Exercise
1  of Discretion. The trial court possesses no unbridled discretion
to refuse a change of venue.

PRINCIPLE APPLIED: A mother and son were jointly
indicted for the murder of the son's wife. The son was tried
and convicted. The mother, at a subsequent term of court,
moved for a change of venue, and supported the same with
a showing substantially as follows, to wit:

That the son's trial was sensational, and therein the facts
relied upon by the State were gone into in great and minute
detail before a great concourse of people; that such details
were industriously disseminated among practically all the
people of the county by long-continued and biased accounts in
newspapers of large influence and circulation; that through-
out the county the mother's chastity was strongly questioned,
and she was, quite largely, deemed criminally responsible for
the death, some years before, of her own husband; that it was
practically impossible to secure affidavits of the existence of

prejudice, though many responsible people admitted such to be
the fact, but declined to sign affidavits for fear of incurring the
displeasure of other citizens; that talk was quite largely in-
dulged in over the county that a change of venue would be
expensive to the county; that the attorneys for defendant
were severely criticised by many people for defending one so
guilty; that it was currently reported throughout the county
that the judge who presided at the son's trial had stated that
he regarded the son as less guilty than the mother.

The counter showing by the State did not deny the fore-
going state of facts, but the record revealed the fact that the
State readily secured 487 separate affidavits that no prejudice
existed.

*Held,* the court abused its sound legal discretion by refusing
the requested change of venue.

**HOMICIDE:** Trial—Instructions—Applicability—Aiding or Abet-
ting. *Instructions must be applicable to the evidence.* Held
error to instruct that defendant might be convicted if she
"aided or abetted" another in the commission of a homicide
when the record revealed the fact that there was no evidence
of aiding or abetting.

**CRIMINAL LAW:** Evidence — Self-Incrimination — Coroner's In-
quest. Testimony obtained before a coroner's jury from one
suspected of a criminal homicide, but unrepresented by coun-
sel and not informed of his right of non-self-incrimination, is
not voluntary, and therefore not admissible on the trial of
such person for said homicide.

**CONSPIRACY:** Evidence—Declarations. A prima-facie showing
of conspiracy is a condition precedent to the admissibility of
declarations of one alleged conspirator against the other.

*Appeal from Madison District Court.—*J. H. APPLEGATE,
Judge.

THURSDAY, OCTOBER 25, 1917.

DEFENDANT was indicted jointly with her son on a
charge of murder in the first degree. Trial was had to a
jury. The jury returned a verdict of guilty of murder in
the second degree. Defendant appeals. For reasons point-

ed out in this opinion, the cause is reversed.—*Reversed and remanded.*

*John A. Guiher* and *W. S. Cooper,* for appellant.

*H. M. Havner,* Attorney General, *H. H. Carter,* Assistant Attorney General, and *Phil R. Wilkinson,* County Attorney, for appellee.

1. CRIMINAL
LAW: trial:
change of
venue: er-
roneous exer-
cise of dis-
cretion.

GAYNOR, C. J. — The defendant is charged with the crime of murder in the first degree. She was indicted jointly with her son, Fred Meyer, and charged with the killing of Ethel Meyer, the wife of Fred. The crime is alleged to have been committed on the 25th day of July, 1915, and by means of a revolver held in the hands of said Ida E. Meyer, defendant herein, and her son, Fred Meyer. The indictment was returned on the last of October of that year. At the December term of court, she appeared and pleaded not guilty, and filed a motion for a continuance. This motion was sustained. On the 4th day of February, 1916, she again appeared and filed a petition for change of venue, supporting the same by affidavits.

From these affidavits it appears: That her codefendant, Fred Meyer, was tried at Winterset, in Madison County, at the December term, 1915, and a verdict of guilty of murder in the second degree returned against him; that, on this verdict, he was sentenced to the penitentiary for a term of 15 years; that this trial was attended by a large concourse of people and lasted for several days; that there were a large number of jurors summoned and examined, most of whom were present during the trial; that this trial gave great publicity to the affair, and to the facts upon which the State relied for a conviction; that the newspapers of the county, while assuming to publish reports of the trial as it progressed, gave coloring to the facts by comment and innuendo unfavorable to this defendant, thereby producing

in the minds of the people a settled conviction that this defendant is guilty of the offense charged against her; that these newspapers began the publication of their accounts of the tragedy soon after its occurrence, and continued comment upon the facts developed as the investigation proceeded, greatly to the prejudice of this defendant; that these newspapers have a large circulation, and are influential in the county, and are taken and read by most of the citizens of said county; that the public mind is no longer in a condition to receive patiently, and weigh impartially and dispassionately, the evidence which may be adduced in said cause for and in behalf of the defendant; that the public mind has been poisoned against the defendant in said county by the circulation of untrue rumors touching the chastity of this defendant, and in the circulation of false stories as to the cause of the death of her husband; that it has been persistently and generally circulated through said county that the defendant's husband came to his death by foul means; that it has been falsely circulated that this defendant was instrumental in causing his death; that it has been falsely circulated throughout the county that the defendant is a woman of bad character. It appears from the affidavits of the attorneys who represented her in this cause that, when they approached citizens with a request for signatures to the application for a change of venue, they were refused, on purely prudential grounds; that citizens asserted and claimed that to do so would be prejudicial to their private interests. The same attorneys assert in their affidavits that, during the trial of the son, it was frequently said to them by residents of the county that there was no doubt of the *mother's* guilt; that there would be no trouble in showing *her* guilty; that she had murdered her husband and should have been sent to the penitentiary for that, and that now she must go; that it was said by many citizens of the county that they could not believe that reputable at-

torneys would allow themselves to be employed in the defense of such a guilty person as Mrs. Meyer; and that many friends had said to them that people were surprised that a reputable attorney would be employed in the defense ot one so guilty as Mrs. Meyer, and that it would hurt these attorneys in the estimation of good people to be so employed. These attorneys stated that the publicity given to the trial of Fred Meyer, and the rumors and gossip circulated touching Mrs. Meyer's character and her connection with the death of her husband, had so prejudiced the people of the county against her that, in their judgment, she could not obtain a fair trial in the county. It further appears that it was currently reported throughout the county that the judge who tried Fred Meyer and sentenced him to 15 years in the penitentiary stated that he would have sentenced him to a longer term if he had not believed that Fred Meyer had little to do with the crime; that Ida E. Meyer, this defendant, was the one who really committed the murder. The affidavits of these attorneys show that they had spoken with many people touching her claim for a change of venue, and that the people spoken to admitted that the prejudice against her was so strong that she could not have a fair trial, but declined to sign affida-vits because they did not want to incur the ill will of persons interested in the prosecution.

It appears from a reading of the newspaper reports of the tragedy and of the trial of Fred Meyer, as the same have been submitted to us, that every detail touching the tragedy and the manner in which it is claimed to have occurred was fully published and circulated through the county; that detailed accounts of the testimony of witnesses on the trial of Fred Meyer were published, with comment, and with suggestion as to discrepancies that appeared in the testimony, and, though perhaps not intentionally so, they received the coloring which is naturally given by those

who have the conscious feeling that the defendant is guilty of the offense charged. For instance, in one publication made on January 13th, in one of the leading newspapers of the county, it was said:

"Mrs Ethel Meyer, bride of only a few months, was found dying in the Meyer home, northwest of here, on July 25th, with bullet wounds in her head, and a revolver lying by her side. Meyer and his mother assert the young bride committed suicide, using the revolver that lay beside her to commit the act. The State proved, however, that this revolver had been long unused, and could scarcely have been discharged by one of Mrs. Meyer's strength (meaning the younger Mrs. Meyer)."

In another publication it was said:

"It was developed at the inquest that the bullet found in the cavity, practically intact, weighed but 74 grains, while the bullet from the cartridge in the revolver which Meyer said was found in his wife's hand weighed 154 grains."

Further, it was said:

"There was evidence before the grand jury that Meyer and his mother did not tell the same stories; that they tried to cover up some of their actions, and destroyed some of the bed clothing which was blood-soaked."

It further appeared in said paper as follows:

"The fact that Fritz Meyer had been found dead in the fields years ago was recalled. Young Meyer is declared by a neighbor to have said, 'I suppose I will have to pound stone for this.' "

It appears that the Des Moines Tribune, a paper circulated in said county, on December 9th contained a partial report of the trial. The report began:

"The Revolver Was Not Close to the Dying Woman. The revolver with which Fred Meyer and his mother in-

sist Mrs. Ethel Meyer killed herself was not lying beside the dying woman when he arrived at the Meyer home a few minutes after the shooting, so testified Albert Kneuper, neighbor of the Meyers, today in the trial of Fred Meyer."

It was further published in some of the papers that Fred and his mother had said that, when they discovered the wife dying with a gunshot wound, she spoke, and said to them that she wanted to die ("Folks, I wish to die") ; but that it was shown that the wound was of such nature that this could not be true.

It would be profitless to set out all the comments. They are numerous, and many of the headlines inflammatory. To this showing, the State filed its resistance. Certain witnesses made specific denials of matters to which we have not referred in this opinion. The resistance was supported by an affidavit to the effect that they, the affiants, believed that the people of the county were not only without prejudice against the defendant, but they were without any special knowledge of the case, and that they have no bias or prejudice against the defendant, and that there was no excitement or feeling against her in the county, and that, in their judgment, she could and would receive a fair and impartial trial. This affidavit was signed by 487 residents of the county. The county auditor testifies in addition as follows:

"Was out yesterday securing signatures to affidavit in resistance to petition for change of venue. Secured 110 or 115 signatures all on one affidavit. Left about 8 o'clock and got back about half past 5. No prejudice against defendant."

The deputy sheriff testified that he was out securing signatures to affidavit in resistance to petition for change of venue. "Got 114 signatures. Left a little after 9:00 and got back a little after 4:00. Heard talk while I was out that change of venue would be very costly to the

county, but they did not sign a resistance on that account. No prejudice."

We have not set out all the evidence pro and con on this question, but sufficient to show the general trend of the testimony on this point. The fact that it was generally circulated through the county, after this tragedy, that this defendant had been instrumental in doing away with her husband, and that it had been generally circulated through the county that she was a woman of bad character, is not denied. The number of affidavits in resistance secured by the State is very suggestive of the condition of the public mind, and, we think, tends to support rather than contradict the defendant's claim. No fact herein set out by the defendant upon which prejudice might be predicated is denied by the State. Under this showing, can it be said that the defendant could, in that county, receive a fair and impartial trial? We recognize that there is discretion in the district judge in passing upon all these matters, but it is a sound judicial discretion, one that has in it a recognition of the fact that, in all well regulated governments, the citizen is entitled to life, liberty and the pursuit of happiness; that these he is entitled to enjoy unless forfeited by crime against the law; that one of the guaranties given the citizen, found in the Constitution of the state, is the right to a public trial by an impartial jury when accused of crime. This is the right of the citizen under the law, and it cannot be denied him. If the judicial system is to sustain itself in the confidence and respect of all right-thinking people, there must be no suspicion of unfairness in the administration of public justice. It is fundamental, under our system of government, that one charged with the commission of a public offense is presumed to be innocent until the contrary appears. He is entitled to a fair and impartial trial before a jury of his

peers, uninfluenced by any bias, prejudice or preconceived notions of his guilt. To this end, the trial should be removed from these influences, so far as it lies within the power of the court to do so.

We recognize the fact that it is sometimes difficult to draw a line of demarcation between a state of popular feeling that prevents a fair and impartial trial and that which, though existing, may not reach to that point. Four hundred eighty-seven men have voluntarily signed affidavits that this plaintiff, in their judgment, can receive a fair and impartial trial. Her son had been tried for this same offense and convicted,—tried before a jury of that county. The record shows that many citizens were summoned to that trial, both as witnesses and jurors; that the grand jury of the county found the indictment. Though it might be possible to select twelve men who had no feeling or bias against the defendant on entering the jury box, yet the trial was to be had in the same community in which the other jurors found her son guilty, under practically the same showing that the State intended to urge against her. During the time of that trial, the courthouse was crowded. Influences from without the jury would, under the showing made, be strong and prejudicial to any fair trial of this defendant. We can reach no other conclusion under this record than that the defendant is entitled to the change prayed for. The court, however, overruled the motion, and this is the first ground of error assigned. This ground must be sustained.

2. HOMICIDE: trial: instructions: applicability: aiding or abetting.

Thereafter, a jury was impaneled, and the defendant tried and convicted of murder in the second degree. Upon the trial, the court told the jury that they could convict the defendant though they did not find that she actually fired the shot that took the life of Ethel Meyer, and said to them that, if they found from the evi-

dence, beyond a reasonable doubt, that she aided, assisted, or abetted Fred Meyer in taking the life of Ethel Meyer, they should convict her. These instructions were objected to, and complaint of them is made here. A careful reading of the record discloses that there was no basis, in the facts proven, for submitting to the jury the guilt of the defend- ant on the theory that she aided or abetted her son in the commission of the crime. Verdicts cannot be allowed to rest on mere suspicion, or upon a state of facts not shown to exist. There is no evidence that she aided or abetted or assisted her son in the commission of the crime. That this was error, and prejudicial, see *State v. Fuller*, 125 Iowa 212; *State v. Myer*, 69 Iowa 148; *State v. Meyer*, 180 Iowa 210.

3. CRIMINAL LAW: evi- dence: self- incrimina- tion: coro- ner's inquest.
It is next contended that the court erred in permitting the State to introduce tes- timony given by the defendant at the cor- oner's inquest. It is claimed that, after the occurrence of the tragedy, the matter came before the coroner of the county for investigation, and a jury was impaneled to inquire into the cause of the death of Ethel Meyer. It is claimed that this defendant was subpoenaed before the coroner and sworn to give evidence at said hearing; that she was unrepresented by counsel, and in no way admonished of her rights; that her testi- mony was not voluntary, but was given under compulsion, and therefore was not admissible against her when charged with the crime. The voluntary admission of crime or of facts tending to connect one with the commission of a crime are all receivable against him when on trial for the crime, but it is fundamental that no one can be compelled to give testimony against himself involving him in criminality. To be voluntary, it must be spontaneous. It must be the free- will offering of his own mind. Clearly, if one is called into a judicial proceeding in which his guilt or innocence is

involved, he cannot be required to testify as to any matter which would tend to incriminate him. If he is compelled to answer, under oath, questions put to him by a judicial officer having charge of an investigation touching his connection with the crime then being investigated, statements then made are not admissible in any future proceedings involving the same offense, when he is put on trial for that offense. One who voluntarily appears, takes an oath and submits to an examination before a coroner's jury, sitting to investigate and determine the cause of the death of another, cannot have his evidence so given considered privileged. But if it appears that a coroner's jury is sitting to investigate the cause of the death of one whose death is suspected to have been the result of foul play, and the one who is suspected of being implicated in the crime is summoned or subpoenaed to appear before the jury and give testimony, and is sworn to tell the truth, and is not informed of his right to refuse to testify, and is not provided with counsel, and is compelled, or believes he is compelled, to answer questions propounded to him by the coroner or by those assisting in the investigation, his answers so given cannot be said to be voluntary, and cannot be used against him thereafter, in the event he should be ultimately formally charged with the commission of the crime investigated.

It is apparent in this record that, at the time the coroner's jury was sitting, this defendant was suspected of the commission of this crime, subpoenaed, and examined for the purpose of verifying this suspicion. The whole trend of the examination shows this suspicion and this purpose. She was examined and cross-examined. Other testimony was given, contradicting what she said. She was again called to explain, examined and re-examined. The examination shows, we think, that it was the thought of the in-

quisition that her hands were red with blood, and that by her own mouth her guilt, could be shown. We think evidence obtained in this way would not be admitted against her. To allow it would be violative of well established rules recognized by this court. The same power that punishes makes also the law that protects. See *State v. Storms,* 113 Iowa 385, 387; *State v. Clifford,* 86 Iowa 550; *Tuttle v. People,* 33 Colo. 243; *Cicero v. State,* 54 Ga. 156; *State v. O'Brien,* 18 Mont. 1; *State v. Young,* 119 Mo. 495; *Farkas v. State,* 60 Miss. 847; *State v. Senn,* 32 S. C. 392.

4. CONSPIRACY: evidence: declarations.

Inasmuch as this case must be reversed, we refrain from any discussion of the weight or sufficiency of the evidence, but have to say that, in absence of proof of any conspiracy, declarations made by one jointly indicted with another in the commission of a crime are not admissible against the other. To render competent evidence of acts or declarations of a person other than the defendant, there must be proof of conspiracy, and even then the acts or declarations must be in furtherance of the conspiracy. There is no proof of conspiracy in this case between the son and the defendant, and the statements themselves are not sufficient to prove the conspiracy. *State v. Crofford,* 121 Iowa 395.

Other matters are discussed which we do not think will arise on another trial of this cause, and they are not, therefore, considered in this opinion.

For the errors pointed out, the cause is — *Reversed and remanded.*

LADD, EVANS and SALINGER, JJ., concur.