STATE, Respondent, *v.* ALLISON, Appellant.

(No: 8422.)

(Submitted May 17, 1944. Decided October 17, 1944.)

[153 Pac. (2d) 141.]

*Mr. William E. Keeley, Mr. Daniel L. O'Hern* and *Mr. Maurice J. MacCormick,* for Appellant, submitted an original and a reply brief; *Mr. Keeley* argued the cause orally.

*Mr. R. V. Bottomly,* Attorney General, *Mr. Fred Lay,* First Assistant Attorney General, *Mr. Felkner F. Haynes,* Special Counsel, and *Mr. J. J. McIntosh,* County Attorney, for Respondent, submitted a brief; *Messrs. Bottomly, Lay* and *Haynes* argued the cause orally.

MR. JUSTICE ADAIR delivered the opinion of the court.

An information accusing James S. Allison of the murder of Mack Hall was, on July 28, 1942, filed in the district court of Rosebud County, Montana, by the county attorney of said county. Upon his trial, Allison was convicted of murder in the second degree and sentenced to imprisonment for 20 years. From the judgment of conviction this appeal is prosecuted.

At about 11 o'clock on Sunday morning, July 26, 1942, the defendant James S. Allison stopped two automobiles passing through the village of Cartersville in Rosebud County and, informing the occupants thereof that there was a dead man at

his place of business, he requested them to so advise the sheriff. Proceeding to a tavern owned and operated by the defendant at Cartersville, the motorists viewed the dead body of Mack Hall which was lying just outside the rear door of the tavern. He had been killed that morning by a bullet which had entered his mouth and lodged in his second spinal vertebra causing instant death. The undersheriff at Forsyth was notified by telephone, receiving the call at about 11:20 o'clock a. m. Thereupon the undersheriff, the county coroner, the county attorney, the official court reporter of the district court of Rosebud County, a physician and others drove from Forsyth to Cartersville, a distance of about 14 miles, and proceeded to impanel a coroner's jury and hold, at defendant's tavern, a coroner's inquest. The county attorney directed all the proceedings at the inquest. He ordered the defendant Allison to take the witness stand. Allison obeyed the order. He took the stand, and was sworn. He was then examined and cross-examined at considerable length by the county attorney. He was the first witness to testify at the inquest.

The statements made by the defendant while testifying at the coroner's inquest were neither confessions nor admissions of guilt, but all of his testimony was given in response to questions put to him by the county attorney. After covering an extensive field of inquiry, the county attorney finally asked the defendant the question, "Do you know anything more about the death of Hall the deceased?" and the defendant gave his answer to such question.

The inquest being concluded, the undersheriff, thereupon and on the same afternoon, took the defendant Allison to Forsyth and locked him in the county jail where he remained a prisoner until after the filing of the information here, when he was released on bail.

The defendant was not represented by counsel at the inquest and he was not warned that his statements might be used against him or that he was privileged, under the Constitution and Codes of this state, to refuse to testify if he so elected. The defendant

had not been informed and he testified that he did not then know that he had the right and the privilege under the law to decline to testify. It further appears that it was because defendant then believed that he was required to obey the order of the county attorney that he took the witness stand as directed and answered the numerous questions put to him by the county attorney. No eye witness to the killing was found and the evidence against the defendant was purely circumstantial.

As part of the chain of circumstances, the trial court, over defendant's objections, permitted the State to introduce, on its case in chief, all the testimony given by the defendant at the coroner's inquest and defendant here assigns error in admitting such testimony.

The Bill of Rights of the Constitution of Montana guarantees that: "No person shall be compelled to testify against himself, in *a criminal proceeding.*" (Emphasis ours.) (Const. Art. III, sec. 18.)

This privilege is not merely a formal technical rule, which may be enforced or dispensed with at the discretion of the courts. It is a mandatory, constitutional provision, securing to every accused person a valuable and substantial right. In holding an inquest the coroner acts judicially. (*Commonwealth* v. *Hawkins,* 3 Gray, Mass., 463; *People* v. *Devine,* 44 Cal. 452; *Boisliniere* v. *Board of County Commissioners,* 32 Mo. 375.)

"A coroner's inquest has been broadly defined as a tribunal charged with the duty of investigating crimes, and, more specifically, as an investigation into the cause of death by a coroner with the aid of a jury. * * * Although an inquest is essentially *a criminal proceeding,* at least from the time when the felonious homicide is established, nevertheless, it is not a trial involving the merits, but rather a preliminary investigation." (Emphasis ours.) (18 C. J. S., Coroners, sec. 14 p. 293.)

There is also a legislative enactment which provides: "A defendant in a criminal action *or proceeding* cannot be compelled to be a witness against himself; but he may be sworn, *and may testify in his own behalf,* and the jury * * * may take

into consideration the fact that he is the defendant, and the nature and enormity of the crime of which he is accused. *If the defendant does not claim the right to be sworn, or does not testify, it must not be used to his prejudice, and the attorney prosecuting must not comment to the court or jury on the same.* (Sec. 12177, Rev. Codes.) (Emphasis ours.)

In the early case of *State* v. *O'Brien,* 18 Mont. 1, 43 Pac. 1091, 1093, 44 Pac. 399, this court reversed the judgment of conviction therein and, speaking through that eminent jurist Mr. Justice Hunt, said: "The court ought not to have permitted any of the evidence given by the defendant before the coroner to be introduced. It plainly appears that the defendant was called before the coroner by that official immediately after the homicide, and testified without any knowledge of his lawful rights, without the aid of counsel, and under a belief that he had to answer the questions put to him."

Almost half a century has passed since this court decided the *O'Brien Case,* supra, but it was good law then; it is good law now and this court has never departed from the rule there announced.

In *Tuttle* v. *People,* 33 Colo. 243, 79 Pac. 1035, 1039, 70 L. R. A. 33, 3 Ann. Cas. 513, the court held it to be reversible error for the trial court to admit in evidence the statements made by defendants at the coroner's inquest, citing with approval this court's holding in the *O'Brien Case,* supra. At the time the defendants made the statements to the coroner in the *Tuttle Case,* they were not then under arrest; no information had been filed against them; their statements were not confessions nor admissions of guilt; and the defendants had made no objections to testifying. However, it appeared that the defendants were not represented by counsel at the inquest; that they had not been warned that their statements might be used against them; and that they had not been informed that they were privileged to refuse to testify if they so elected. In its opinion therein, the supreme court of Colorado said: "The Constitution of the state (section 18, Art. 3) provides that 'no

person shall be compelled to testify against himself in a criminal case.' This provision was not intended merely for the protection of the individual in a criminal prosecution against himself, but its purpose was to insure that a person could not be required, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime. (*Counselman* v. *Hitchcock*, 142 U. S. 547, 12 S. Ct. 195, 35 L. Ed. 1110; *Emery's Case*, 107 Mass. 172, 9 Am. Rep. 22.) Any other rule would render it possible to deprive parties of the constitutional safeguard referred to. Officials engaged in ferreting out crime could refrain from arresting or taking into custody those suspected of its commission, and, under the guise of bringing before a coroner's jury as witnesses persons who would be afraid to assert their constitutional rights, secure from their own lips testimony which could afterwards be used against them. This, though an indirect way of seeking to avoid the constitutional provisions, would as directly deprive persons of its protection as though they had been required to give testimony against themselves after arrest.''

In the record before us in the instant case, it appears that the defendant Allison had been doing a lot of heavy drinking on the day of the inquest before the officers appeared on the scene and that he took on more whiskey after they arrived. When asked at the trial if the defendant showed evidence of drinking on the afternoon of the inquest, the undersheriff, a witness for the state, replied: ''Well, there was kind of a mixture there between whiskey, scared and nervousness.'' It appears that at and prior to the inquest the county attorney was aware of defendant's aforesaid condition and that the county attorney then suspected the defendant of being implicated in the commission of the crime. At the trial defendant's wife testified that on Sunday, July 26, 1942, she received at Miles City a long distance telephone call from the county attorney informing her that there had been some trouble at defendant's place of business; that Babe Hall had been killed; that the defendant ''was drinking pretty much;'' that the county attorney thought she

should be there; that Mrs. Allison thereupon said "I hope you don't think Jim is mixed up in it" and the county attorney replied, "Well, I don't know, it looks like it has been done from the inside;" that about 20 minutes later Mrs. Allison, accompanied by her daughter, left Miles City and proceeded by automobile direct to Cartersville and when they arrived there the defendant was then on the witness stand testifying at the inquest. The state did not cross-examine Mrs. Allison nor did it offer any evidence that would in any wise contradict her testimony.

Under the circumstances shown by this record, the defendant should not have been ordered by the county attorney to take the witness stand and to testify without being first informed of his right to counsel, of his right to refuse to testify if he so elected, and without being first warned that his statements might thereafter be used against him. It must be remembered that, "The same power that punishes makes also the law that protects." (*State* v. *Meyer*, 181 Iowa 440, 451, 164 N. W. 794, 798.)

The supreme court of Iowa in *State* v. *Meyer*, supra, in reversing a judgment of conviction for murder cited with approval the *O'Brien Case,* supra, and held that testimony obtained before a coroner's jury from one suspected of a criminal homicide, but unrepresented by counsel and not informed of his right of non-selfincrimination, is inadmissible on the trial of such person for the homicide.

The defendant Allison urged at the trial that the admission in evidence of his testimony at the coroner's inquest would violate the rights guaranteed him by the Constitution. In overruling such objection the trial court observed: "It is my opinion that the *testimony* given by the defendant at the coroner's inquest is not a *confession but,* at the most, *is purely a statement of the accused of facts pertinent to the issues and tend to prove other facts of guilt.* I therefore hold that a foundation is not necessary for the admission of this testimony in evidence, and the objection is overruled."

The admissibility of the offered testimony was not to be tested

 by whether it was a confession, voluntarily or involuntarily given, or whether it was an admission against interest. Section 18 of Article III of the Constitution of Montana mentions neither confessions nor admissions. The privilege and guaranty extend to any matter or thing that the accused was compelled to say in a criminal proceeding which might be used against him. It applies to any such *testimony,* irrespective of whether it be in the nature of a confession or an admission or simply of facts pertinent to the issues and tending to prove other facts of guilt, for the constitutional provision · protects every person from being compelled to furnish any part or portion, however small, of the *testimony* by which his conviction of a criminal offense might be secured. (*Tuttle* v. *People,* supra; *Wood* v. *United States,* 1942, 75 U. S. App. D. C. 274, 128 Fed. (2d) 265, 141 A. L. R. 1318.)

In *Tuttle* v. *People,* supra, the · court said: "The Attorney General contends that the admissions made were not confessions of guilt, and for that reason do not come under the general rule regulating the admissibility of confessions. We do not think this objection is tenable. The constitutional provision was not intended to merely protect a party from being compelled to make confessions of guilt, but protects him from being compelled to furnish a single link in a chain of evidence by which his conviction of a criminal offense might be secured. (*State ex rel. Attorney General* v. *Simmons Hardware Co.,* 109 Mo. 118, 18 S. W. 1125, 15 L. R. A. 676; *State* v. *Spier,* 86 N. C. 600.)

"Crimes should be punished. Officials are to be commended for taking prompt steps to apprehend criminals, but, whatever may be the opinion of a community with respect to the guilt of those accused of crime, or however convincing the testimony may be against them, their rights guaranteed by the Constitution must be respected."

At the trial the county attorney testified to the conclusions that the defendant "willingly took the witness stand" and "volunteered himself as a witness" and the contention is here made that the defendant thereby waived the privilege

against self-incrimination. However, it must be remembered
that the record shows that the defendant did not know his
rights, nor was he informed of them. The rights guaranteed by
the Constitution apply to all alike—the well-informed who know
their rights as well as to the ignorant who never heard of such
rights. There stands the right like the rock of Gibraltar and it
so remains protecting the life and liberty of every person
whether the particular person knows about it or not. True the
right may be waived, but such waiver, to be recognized by the
courts, must be informed and intelligent for there can be no
waiver by one who does not know his rights or what he is waiv-
ing. "It has been pointed out that 'courts indulge every reason-
able presumption against waiver' of fundamental constitutional
rights and that we 'do not presume acquiescence in the loss of
fundamental rights.' " (*Johnson* v. *Zerbst*, 1938, 304 U. S. 458,
464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461, 146 A. L. R. 357.)

In Vol. 8 of Wigmore on Evidence, 3rd Ed., sec. 2276, at
pages 450 and 451, the author says: "The waiver involved in
the accused's taking the stand is *limited to the particular pro-
ceeding* in which he thus volunteers testimony. His voluntary
testimony before a *coroner's inquest*, or a *grand jury* or other
preliminary and separate proceeding, * * * is therefore not a
waiver for the main trial; * * *."

In *Wood* v. *United States*, 75 U. S. App. D. C. 274, 128 Fed.
(2d) 265, 268, 141 A. L. R. 1318, the court held that the privilege
against self-incrimination guaranteed by the Bill of Rights in
the Federal Constitution was invaded by a trial court which
admitted in evidence the pleas of guilty theretofore made by the
defendants at the preliminary hearing in police court. Speaking
through Mr. Justice Rutledge, the court said:

"The privilege has sanction in the Bill of Rights, and before
that in a long but victorious struggle of the common law. It
protects against the force of the court itself. It guards against
the ancient abuse of judicial inquisition. Before it judicial
power, including contempt, to enforce the usual duty to testify,
dissolves. No other violence or duress is needed to bring it into

play than the asking of a question. It excludes response regardless of its probative value. * * *

"Like all judicial proceedings, the hearing is inquisitorial in a broad sense. But its purpose is not to convict. That is the trial court's function. Nor is it to procure evidence *for conviction.* That is the prosecutor's duty. It is rather to decide between the informer or prosecutor and the accused on the preliminary question of his temporary restraint. In this the court stands between them, not as partisan, but as judge. In subject matter and function, the hearing is judicial. It should be so in essential procedure.

"It cannot be, therefore, that the court's power to examine the accused, though conferred by statute, means authority to compel him to answer, with the sanction of contempt, or to do so in any manner which would violate constitutional right. * * * The power of examination, therefore, goes no further than is constitutionally permissible in a judicial proceeding. Nor should the hearing be made a trap for luring the unwary into confession or admission which is fatal or prejudicial. So to use it would pervert its function and make of the court, not an arbiter, but an arm of the prosecution.

"This would bring back the very evil the privilege was created to destroy. Historically it was the preliminary inquisition which gave rise to the privilege. It was won through centuries of struggle against abuses of magisterial as well as more formal judicial inquisition. * * * Perhaps the most ancient ancestor of the privilege in the common law system was the practice of the ecclesiastical courts in putting laymen to answer ex officio to penal charges. The resulting jurisdictional controversy ended in stripping them of this power when the Court of High Commission was abolished. With it went the Court of Star Chamber, equally notorious for similar abuses. Inevitably, though later, the privilege was extended to the civil and the criminal courts. Its development has brought us far from the day when a judge could say, with authority, 'Confess, Mr. Lilburn, and give glory to God.' The story is too long, and has been told too well by

others, for repetition here. But the privilege was full grown in England, and had reached an almost indigenous maturity here, when the Fifth Amendment became the law of the land.

"The protection was not intended to be illusory. It would be so, if confined to the actual trial. In practical effect, especially for persons unable to retain counsel, this would make it a nullity. The privilege would be worth little or nothing if the magistrate could force the accused on preliminary examination to speak his own conviction and this could be used against him on the final issue. No such shadow of security was purposed. * * * The aid of counsel in preparation would be farcical if the case could be foreclosed by preliminary inquisition which would squeeze out conviction or prejudice by means unconstitutional if used at the trial. * * *

"We do not think the court can use its power to elicit the plea at one stage for one purpose and then abuse it by admitting the pleas as 'evidence' at another and for an entirely different purpose. To do this would be the most subtle form of judicial inquisition. It would accomplish indirectly but substantially the very thing the privilege prohibits. * * *

"The fairer practice and, we think, the only one consistent with the court's position, would advise the accused in all cases, before permitting him to speak even as a volunteer, of his right to counsel and would warn him that he need not speak and, if he does, it is at his peril. This would assure fairness to the accused and foreclose the possibility that he might act in ignorance. It would eliminate the risk of reversal inherent in failure to give the advice or warning. The cost to the court in time and energy would be small, and that to society in efficient administration of criminal justice would be less than the prevailing practice entails. On the other hand, the cost to the accused, especially when he is indigent, of the court's failure to follow the more open and certain way may be great. Finally, such a practice would be consonant, as the prevailing one is not, with the court's obligations to see that trial or hearing is fair and to discharge the affirmative duties which it owes to persons charged

with crime, more particularly when they are ignorant or indigent or both. * * *

"This case, and others recently decided, show the difficulties and the dangers of turning admissibility or waiver on knowledge, when the accused does not have counsel and the court has failed to inform or warn him concerning his rights. The rule would not be simple, easy or certain in administration. It should be so when fundamental rights of this kind are involved. * * *

"But if knowledge should be material the facts in this case dictate the same result. As with the right of counsel, waiver of the privilege must be informed and intelligent. There can be no waiver if the defendants do not know their rights. The rule must be the same, we think, when the record is silent or inconclusive concerning knowledge. Basic constitutional protections, especially in criminal cases, should not be suspended by mere inferences from indifferent facts or doubtful presumptions, whether of law or of fact. * * *

"It is sufficient to rule that when, as here, the accused is without counsel and it does not appear clearly that he knows his rights and intends to waive them, the 'plea' or its substantial equivalent, made without warning or advice, cannot be received in evidence against him. Any other rule would make of the hearing a trap and an inquisition, with consequences for the accused and for the judicial system not tolerable under the Constitution.

"In ruling as we do, we recognize that the policy of the privilege has been debated vigorously. Much has been said for and against it. So far effective proposals for abolition or other than judicial restriction have not been put forward. The debate is therefore more pertinent to the scope which the courts permissibly may give the privilege. Criticism of the privilege has grown with organized crime and evolution of a judicial system which, while imperfect, has brought us far from the Inquisition or Courts of High Commission and Star Chamber. But with these has come also specialized proficiency in detection and prosecution to off-set the loss, if any, to society in safety

from criminal activities through disappearance of all but the more subtle forms of judicial inquisition. The modern division of labor in the process of administering the criminal law permits these too to go without impairing it. With world events running as they have been, there is special reason at this time for not relaxing the old personal freedoms won, as this one was, through centuries of struggle. Men now in concentration camps could speak to the value of such a privilege, if it were or had been theirs. There is in it the wisdom of centuries, if not that of decades.

"Large in this is a sense of fairness to the person accused, a respect for his individual integrity, in accusation or even in guilt. But larger still is the sense of the court's own part in justice and its administration. By this we mean the sense of the citizen as well as of the court itself. It cannot be partner or partisan with the prosecutor, subtly or otherwise, and retain the confidence of the accused and the public or its own self-respect. Neither can it be coddler of the criminal. In our system the accused is not such until the jury pronounces 'guilty.' Until then the court, whether magistrate or trier of ultimate fact, should not extract the word from him or permit its use against him for conviction when it or another court has done so. The privilege still stands guard when so much is attempted by inquisition, however subtle, at any stage of the proceedings, preliminary or otherwise. If it is desirable that magistrates continue to have this power, it can be done constitutionally, if at all, only by giving the accused immunity to use of its results on his trial. That is what we now do."

One of the jurors at defendant's trial had also sat on the ██ coroner's jury at the inquest upon the body of Mack Hall, deceased. Such juror must have viewed the body of the deceased, heard the testimony of the various witnesses at the inquest including that of the defendant, participated in the deliberations of the coroner's jury and the record shows that he signed the verdict and findings of that jury. The *voir dire* examination failed to reveal that the trial juror had served on the coroner's

jury and defendant's counsel did not learn of such fact until after the trial jury had been selected and sworn to try the case. The county attorney however must have been aware of the fact for he directed the proceedings both at the inquest and at the trial and it would seem that he should have informed the trial court of the situation rather than run the chance of a mistrial or reversal, with attendant expense. Defendant's counsel likewise should have taken prompt action in properly bringing the matter to the attention of the trial court but this they did not do and they made no attempt whatever to inform the trial judge until after a verdict had been returned when they presented affidavits disclosing the facts on motion for a new trial. While the statute provides that a challenge for implied bias may be taken when the prospective juror has served on a coroner's jury which inquired into the death of a person whose death is the subject of the indictment or information, (sec. 11960, Rev. Codes, subd. 4), yet when counsel later gain knowledge of such disqualifying facts they have a duty to perform to both the court and the defendant and they may not sit idly by and say and do nothing about the matter until after an unfavorable verdict has been returned and, then, for the first time urge such facts as grounds for a new trial.

The record shows that at the start of the trial, before any evidence was introduced and before the county attorney had made his opening statement, the trial court and counsel for the state were advised that the defendant would attempt to have the trial court reject and exclude the testimony given by the defendant at the inquest. However, had the defendant succeeded in causing the testimony to be excluded, of what would it have availed him? With a member of the coroner's jury sitting on the trial jury, such testimony would have been known to and considered by him and, in all probability, before a verdict was reached so much of the testimony as such juror could recollect would have been imparted to and considered by the other eleven members to the prejudice of the defendant and in violation of his rights under the Constitution.

Not only shall no person "be compelled to testify against himself, in a criminal proceeding" but the accused shall have the right to a trial "by an impartial jury," (Const. Art. III, sec. 16), and he shall not "be deprived of * * * liberty * * * without due process of law." (Const. Art. III, sec. 27). Officers of the court must appreciate the risk that is attendant to the denial of any of the fundamental rights guaranteed an accused person by the Constitution and they must be vigilant, prosecutor as well as defender, to report such violations to the trial court at the earliest opportunity to the end that a reversal be not required.

When, as here, it is made to appear that a substantial right has been denied the defendant, his conviction will not be upheld. (*State* v. *Brooks*, 57 Mont. 480, 188 Pac. 942.) It is clear that the admission in evidence at the trial of the testimony which the state obtained from the defendant Allison at the inquest in the manner shown by the record was and is violative of the rights guaranteed the defendant by the Constitution of this state. This requires a reversal of the judgment and a remanding of the cause.

On another trial the state is precluded from using any of the testimony given by the defendant either at the coroner's inquest or at his trial in the district court in the absence of such conduct on the part of the defendant hereafter as shall amount to a lawful consent to its use or a lawful waiver of his right to have same excluded.

We have canvassed such specifications of error as relate to instructions but find no error in the refusing or giving of any of the instructions mentioned. Numerous other specifications of error were set forth and argued but as they deal principally with the sufficiency of the evidence to sustain the judgment we find it unnecessary to here pass upon such specifications.

The judgment of conviction is reversed and the cause remanded for new trial in accordance with this opinion.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANDERSON and ERICKSON concur.

Mr. Justice Morris:

I dissent. I think the judgment should be reversed and the cause remanded for a new trial, but not for the reasons given by the majority. It is revolting in the extreme to contemplate the drunken acts and conduct of the defendant at his saloon the evening of July 25th and early morning of July 26th, but the evidence does not disclose any malicious intent to take human life, and for that reason I think the motion of the defendant to "remove from the consideration of the jury murder in the second degree" should have been granted, and the defendant tried for manslaughter.

I further do not agree with the majority as to the line of reasoning on the question of the "Privilege against self-crimination." Article III, section 18 of the Constitution of Montana provides: "No person shall be *compelled* to testify against himself, in a criminal proceeding."

In 8 Wigmore on Evidence, 3rd Ed., beginning on page 321, a clause is quoted from the Constitution of the United States similar to that quoted from the Montana Constitution above, and likewise in the same note Mr. Wigmore gives an excerpt from the Constitutions of forty-six of the forty-eight states, and from the Philippine Islands, and without exception the word *compelled* is used. The majority opinion leans toward the view that one accused of crime should not be *permitted* to testify, while the rule is that he may testify if he desires but may not *be compelled* to do so. Nearly all the cases cited by the majority relative to the question, in mentioning the rule, use the word *compelled*. The evidence in the case at bar does not show that the defendant was compelled to testify either at the inquest or the trial, and in the new trial if any attempt to set up compulsion in the former proceedings is made by the defense, I think it would result in error if allowed. The defendant at the trial testified that he was told by the county attorney to take the witness stand at the inquest; the county attorney testified that the defendant volunteered as a witness, saying he wanted to tell what he knew "about this thing." The circumstances

support the county attorney. The record shows that the defendant manifested a strong desire at the inquest and at all times after the dead man was found on his doorstep and up to the time of the inquest to talk to any one who would listen.

As to the case of *State* v. *O'Brien*, 18 Mont. 1, 43 Pac. 1091, 1093, 44 Pac. 399, being an authority on the point of alleged error by the trial court in allowing the testimony of the defendant at the inquest to be read to the jury at the trial, the *O'Brien Case* was not reversed on any such ground. In ordering a new trial in that case Mr. Justice Hunt, in speaking for the court, said the trial court ought not to have permitted the testimony given by the defendant to be introduced at the trial and as the reason for his statement said: ''It plainly appears that the defendant was called before the coroner by that official immediately after the homicide, and testified without any knowledge of his lawful rights, without counsel, and under a belief that he had to answer the questions put to him.'' In other words, Justice Hunt believed O'Brien was *compelled* to testify. In the new trial in the case at bar, it should be an easy matter to obtain the testimony of others than the county attorney who were present at the inquest and who can give testimony as to whether the defendant was ordered or volunteered to testify at the inquest. I do not think one is justified in assuming that the court intended to say in the *O'Brien Case* that a judgment of conviction should be reversed in a case wherein the testimony of the defendant at the inquest was given to the jury at the trial unless such testimony was obtained by compulsion.

Rehearing denied November 25, 1944.