UNITED STATES, Appellee

v.

THEODORE V. WELCH, Second Lieutenant,
U. S. Army, Appellant

1 USCMA 402, 3 CMR 136

403

LT. COL. James C. Hamilton, U. S. Army, for Appellant.
LT. COL. Paul J. Leahy, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Petitioner was convicted by general court-martial of conduct unbecoming an officer and a gentleman in violation of Article of War 95, 10 U.S.C. § 1567. He was found guilty on June 6, 1951, and was sentenced to be dismissed from the service. The substance of the charge was that he had cheated on a written examination by wrongfully and dishonorably submitting, as his own solutions, answers not his own. We granted the petition for review directed to the issues of whether error was committed by receiving in evidence incriminating testimony given by petitioner during a preliminary investigation, whether the instructions on the elements of the offense were sufficient, and whether the law officer erred in instructing the court, in effect, that the punishment of dismissal was mandatory for the offense of which petitioner was found guilty.

Disposition of the issues requires that we set out in some detail the background in this case. In the 95th Infantry Battalion, all officers were being subjected to a professional examination on the subject of map reading. The same test was given at different times to different groups of officers in the command. As a result, the answers to the examination had been compromised and were available to all officers, including petitioner, through conversation with those who had taken the test and also through perusal of answer sheets which were circulating within the command. After petitioner took the examination, his answers made it appear that he had had access to the official answer sheet. His answers included directions to scorers which appeared only on the official answer sheet; were in the exact wording of the official answer sheet; and even repeated errors which were contained in the official answers. The officer conducting the examinations reported to the battalion commanding officer that four officers, judging by their test papers, had cheated on the examination. Evidently, the commanding officer reported the situation to higher headquarters. Shortly thereafter, a lieutenant colonel, formerly commanding officer of the 95th Infantry Battalion, was ordered to conduct an official investigation in the matter. He was supplied with the names of the officers who were suspected of cheating. This investigating officer called these officers individually into his presence, placed them under oath and, with the attendance of a reporter, interrogated them concerning the examination. He had in

**404**

front of him their answer sheets and the official answer sheet.

When this officer called petitioner as a witness, he did not inform him of the possible charges against him, nor did he advise him of the nature of the investigation. Petitioner was placed under oath, and asked whether he understood his rights under Article of War 24, 10 U.S.C. § 1495. He replied: "Yes, sir. Anything you ask me I am supposed to tell you the truth." When told that the proceedings were confidential, petitioner replied that it was his understanding that anything said was "between you and I." At the outset of the questioning, and when confronted with the similarity between his answers to the test and the official answers, petitioner was first evasive. The investigating officer continued the questioning, ordering petitioner to "sit up straight." He accused petitioner of lying, shouted at him, and in effect, told him that he was unworthy of being an officer. Petitioner finally admitted that he had obtained, prior to the examination, a copy of the official answer sheet and had memorized the answers. This testimony was received in evidence against him at the trial, over defense counsel's objection.

The question before us is whether, in this preliminary investigation, petitioner was deprived of his right against self-incrimination. The facts in relation to the investigation, as set out above, are not denied. They are drawn from the official transcript of testimony at the investigation, from the testimony of the investigating officer at the trial, and from the uncontradicted statements of petitioner made while testifying concerning the nature of the investigation. There can be no doubt that the privilege against self-incrimination is applicable in the official investigation that was conducted. Article of War 24, supra, expressly states that "No witness . . . before any officer conducting an investigation . . . shall be compelled to incriminate himself . . . ." This view is amply supported by civilian cases which have held the privilege is applicable to grand jury investigations, police court hearings, investigations by the legislature, and even investigations by administrative officials. Counselman v. Hitchcock, 142 U.S. 547, 35 L. ed. 1110, 12 S. Ct. 195; State v. Allison, 116 Mont. 352, 153 P. 2d 141; Internal Revenue Agent v. Sullivan, 287 Fed. 138; Wood v. United States, 128 F. 2d 265, (C.A.D.C. Cir.). The privilege ". . . applies to all proceedings wherein the defendant is acting as a witness in any investigation that requires him to give testimony that might tend to show him guilty of a crime . . . ." United States v. Goodner, 35 F. Supp. 286.

The more difficult question is whether the privilege was here violated. It was not claimed by petitioner. We must, therefore, find sufficient evidence of "compulsion." Lest we be misunderstood, we disclaim at this point any intention of evaluating petitioner's testimony as "involuntary confession." There is a valid and well-recognized distinction between and abuse of the privilege against self-incrimination and obtaining and using involuntary confessions, even though the two are, either correctly or incorrectly, often intermingled. "Where the testimony, though given under oath, does not violate the confession-rule, it may still involve a violation of the privilege; . . ." Wigmore, Evidence, 3rd ed., § 2266. Thus, some courts have held that use at the trial of a confession obtained by duress constitutes a violation of the privilege against self-incrimination. See Bram v. United States, 168 U.S. 532, 42 L. ed. 568, 18 S. Ct. 183. But the converse is not necessarily true. That testimony is received in violation of the privilege against self-incrimination does not automatically render it "involuntary." Thus, if an accused were ordered by the judge to take the stand and then questioned in regard to his guilt or innocence, the privilege would no doubt be violated—but the testimony received would not necessarily be "involuntary." This distinction was recognized by the court in Wood v. United States, 128 F. 2d 265, (C.A.D.C. Cir.), which is very similar, on the facts, to this case. Further, the rule against involuntary confessions, as historically applied, excludes untrustworthy communications. Confessions do not become "involun-

**405**

tary," under the modern view, because elicited by questions, or made while under arrest, or in the absence of counsel, or without warning that they may be used against him, nor by a concurrence of all these factors. Anderson v. United States, 124 F. 2d 58, (C.A. 6th Cir.) ; Wilson v. United States, 162 U.S. 613, 40 L. ed. 1090, 16 S. Ct. 895; Powers v. United States, 223 U.S. 303, 56 L. ed. 448, 32 S. Ct. 281. Some courts have, of course, held inadmissible confessions obtained under some of the circumstances outlined above, but not necessarily because they were deemed "involuntary." Policy considerations attendant upon the enforcement of legislative requirements have often been relied on. See McNabb v. United States, 318 U.S. 332, 87 L. ed. 819, 63 S. Ct. 608. We neither deny nor uphold the validity of such theories in this opinion. We are not to be interpreted as setting out rules applicable to the determination of whether a confession is involuntary. We are concerned with whether there is here a violation of the privilege against self-incrimination through testimonial compulsion in a quasi-judicial proceeding.

The very importance of the privilege requires that it be liberally construed in favor of the accused. Gilbert v. United States, 144 F. 2d 568. We think the nature of these proceedings requires that we be especially suspicious of any intimation that petitioner was compelled to testify. Historically, it was the preliminary inquisition of one not yet charged with crime which gave rise to the privilege against self-incrimination. Wigmore, Evidence, 3rd ed. § 2251. There was a judicial flavor to these proceedings which may not be ignored. This was not a prosecutor's or police officer's interrogation, where zeal in interrogation may often be overlooked as inevitable and, perhaps, necessary. It was not the investigating officer's duty nor purpose to procure evidence for conviction of the witness. He was, presumably, detailed to make an impartial investigation into the circumstances surrounding the taking of the map reading examinations in this command. He became, instead, a prosecutor who used

all the usual devices to procure an admission of guilt from the accused.

Edward Livingston, in his Introductory Report to the Code of Criminal Procedures (Works ed., 1872), had this to say concerning the necessity of strictly applying the privilege against self-incrimination to preliminary hearings: (Quoted in Wigmore, Evidence, 3rd ed. § 2251)

"An unrestrained right of interrogating is very apt to produce insidious and catching questions; instead of a cool and impartial attempt to extract the truth, the examination becomes a contest, in which the pride and ingenuity of the magistrate are arrayed against the caution or evasions of the accused, and every construction will be given to his answers that may fix upon the imputation of guilt."

Our distrust for the manner in which these proceedings were conducted is strengthened by the fact that the investigating officer was in a position to initiate disciplinary action against the accused. He had already been informed of the officers suspected of cheating, and had documentary evidence against them. His report of investigation could have been used by the battalion commanding officer in assessing command punishment under Article of War 104, 10 U.S.C. § 1576, Manual for Courts-Martial, 1949, U.S. Army, paragraph 33. The proceedings were certainly used in making the official determination of whether to prefer court-martial charges against the accused. The report was made available to and used by the officer who conducted the official pre-trial investigation after charges were preferred. Even more direct, this officer could have recommended to his superior that a letter of reprimand be issued to the accused. These immediate possibilities of disciplinary action arising out of his investigation make it all the more important that the accused be afforded the same safeguards there that he would be entitled to at an official trial. No one would doubt the fundamental impropriety of an accused being told by a summary court officer, for instance, to take the stand under oath and then being sub-

**406**

jected, with no understanding of his rights, to the type of inquisition which petitioner was here given. And yet, petitioner could have been subjected as a result of these proceedings; and without further mandatory inquiry, to punishment akin to that which a summary court-martial could adjudge.

There is some significance in the fact alone that petitioner was required to testify under oath. In Bram v. United States, supra, at p. 550, the Supreme Court notes that some older authorities have held that "an examination under oath 'would be a species of duress and a violation of the maxim that no one is bound to criminate himself.'" In Greenleaf on Evidence, 16th ed., § 225, the author states that the "manner of examination" is important. Placing the witness under oath, the author notes, poses the threat of prosecution for perjury and the fear of additional punishment. In United States v. Collins, 25 Fed. Case No. 14,837, at p. 550, the court had this to say concerning preliminary hearings:

> "An inquisitorial examination, under oath, of a party charged with an offense, is repugnant to the principles of personal liberty, which are embodied in every fibre of the common law."

We are impressed by the similarity between the case before us and Wood v. United States, supra. There, the court found a violation of the privilege against self-incrimination where the prosecution used in evidence a plea of guilty by the accused before a police court magistrate, without counsel and without any advice as to his rights. It was there noted that one of the objectives of the police court magistrate, very similar to that of the investigating. officer here, was to exercise discretion as to whether or not the accused should be held for further proceedings. The court labeled the proceedings judicial and concluded that the circumstances of the hearing—the aura of the proceedings and the failure to advise the accused of his rights—showed sufficient "moral pressure" to warrant a conclusion that the privilege was violated.

It is urged by the Government that petitioner here actually waived his right to the protection of the privilege. We have no doubt that the privilege against self-incrimination may be waived. However, any waiver of a substantial right must be "informed and intelligent." Johnson v. Zerbst, 304 U.S. 458, 82 L. ed. 1461, 58 S. Ct 1019; Powell v. Alabama, 287 U.S. 45, 77 L. ed. 158, 53 S. Ct. 55, 84 A.L.R. 527. "Basic constitutional protections should not especially in criminal cases be suspended by mere inferences from indifferent facts . . . ." Wood v. United States, supra, at p. 277. Here, we need not rely on suppositions as to petitioner's understanding of his rights. He stated, when asked by the investigating officer, that his conception of Article of War 24, supra, was that it required him to answer all questions truthfully. The investigating officer made no effort to correct his misunderstanding. Far from understanding that he might exercise his privilege by refusing to answer incriminating questions, petitioner thought that Article 24 *compelled* him to answer the questions. Under these circumstances, there is no merit in the claim of waiver.

The history of the privilege against self-incrimination and the policy adopted by Congress in making it expressly available to members of the Armed Forces, lay the background for an assessment of compulsion here. This was an official investigation, conducted in secret by a field grade officer, formerly the commanding officer of the battalion to which petitioner was attached. The purpose of the investigation was to inquire impartially into circumstances which had given rise to possible charges of cheating against petitioner and the other witnesses. The witnesses were examined under oath. The officer conducting the investigation was, as already noted, in a position to at least initiate disciplinary proceedings against petitioner. These factors enable us to say, following the precedents we have discussed above, that the proceedings were quasi-judicial in nature.

At the outset of the investigation, the officer conducting it did not fully advise petitioner of his rights under Article of War 24, supra. This was a clear

**407**

violation of that Article. Nor did he advise petitioner of the nature of the investigation or of the charges against him. This officer then conducted a searching and inquisitorial examination, utilizing all the devices of an expert prosecutor cross-examining a hostile witness, accompanied by shouting, accusations of falsehood, reprimands, and castigations of character. All these factors inevitably lead to the conclusion that petitioner was, in effect, compelled to incriminate himself. This smacks too much of Star Chamber proceedings. Petitioner did not have a free choice to admit or deny his guilt or to refuse to answer the questions asked.

It follows automatically that the testimony given at this investigation should not have been received in evidence at the trial. Article of War 24, supra, and Article 31 of the Uniform Code of Military Justice, 50 U.S.C. § 602, so command. Further, it matters not that there may be other evidence of guilt. The right here violated flows, through Congressional enactment, from the Constitution of the United States. Military due process requires that courts-martial be conducted not in violation of these constitutional safeguards which Congress has seen fit to accord to members of the Armed Forces. United States v. Clay, (No 49), 1 USCMA 74, 1 CMR 74, decided November 27, 1951. These safeguards are for the protection of all who are brought within the military disciplinary system, and are not to be disregarded merely in order to inflict punishment on one who is believed to be guilty.

In view of the fact that our disposition of the first issue requires a rehearing, it does not appear necessary to discuss the other issues in detail. However, in connection with the claim that the instructions of the law officer were not sufficient, we have read the instructions in question. The law officer read portions from the Manual including a short general discussion as to what constitutes conduct unbecoming an officer and a gentleman, and a statement that the necessary proof was "That the accused did or omitted to do the acts, as alleged;

and the circumstances, intent, and motive, as specified." It appears to us that this general observation falls far short of complying with the mandatory requirements of Article 51(c) of the Uniform Code of Military Justice, 50 U.S.C. § 626. Actually these instructions, in addition to being far too general, contain a reference to "intent" and "motive" which form no basis of the offense charged against the accused.

The third claim made on behalf of the accused is that the law officer in effect instructed the court that the only punishment that could be assessed upon conviction was dismissal from the service. Under the provisions of Article of War 95, supra, in effect at the time the alleged offense occurred, such statement was true. However, the petitioner in this case was not tried until after the effective date of the Uniform Code of Military Justice. Under the comparative article in the Uniform Code, Article 133, 50 U.S.C. § 727, the provision for punishment states that it shall be "as a court-martial may direct." In accordance with our decision in the case of United States v. Downard, (No 266), 1 USCMA 346, 3 CMR 80, decided April 28, 1952, we hold that the sentence to be imposed upon conviction in this case was within the discretion of the court provided that it did not exceed dismissal from the service.

The decision of the board of review is reversed and the case is remanded to The Judge Advocate General of the Army for appropriate action.

Judge BROSMAN concurs.

GEORGE W. LATIMER, Judge: (concurring in the result)

I concur in the result. I do not concur outright because I have certain reservations concerning some of the concepts developed in the Court's opinion and, therefore, prefer to base my reversal on different grounds.

Article of War 24, 10 U.S.C. § 1495, insofar as is important to my concurrence, provides as follows:

"The use of coercion or unlawful influence in any manner whatsoever by any person to obtain any state-

ment, admission or confession from any accused person or witness, shall be deemed to be conduct to the prejudice of good order and military discipline, and no such statement, admission, or confession shall be received in evidence by any court-martial. It shall be the duty of any person in obtaining any statement from an accused to advise him that he does not have to make any statement at all regarding the offense of which he is accused or being investigated, and that any statement by the accused may be used as evidence against him in a trial by court-martial."

This. is explained and amplified by paragraph 127, Manual for Courts-Martial, U. S. Army, 1949, which is as follows:

". . . It is the duty of any person in obtaining a statement from an accused to advise him that he does not have to make any statement at all regarding the offense of which he is accused or being investigated, and that any statement by the accused may be used as evidence against him in a trial by court-martial. (A.W. 24).

"A confession or admission may not be received in evidence if it was not voluntarily made. If the confession or admission was obtained from the accused in the course of an investigation, by informal interrogation or by any similar *means, it may not be received in evidence unless it appears that the accused, through preliminary warning or otherwise, was aware of his right not to make any statement regarding an offense of which he was accused or concerning which he was being interrogated and understood that any statement made by him might be used as evidence against him in a trial by court-martial . . .*"

[Italics supplied.]

The record is crystal clear that the provisions of both the Article of War and the paragraph from the Manual, hereinabove quoted, were violated in that the statement made by the accused was admitted in evidence over his objection when prior to giving it he had not been properly warned of his right

to remain silent and had not been advised that anything he was to say might be used against him as evidence in the trial by a court-martial. Rather than showing that the accused was informed that the evidence might be used, the record affirmatively shows that he was informed his testimony was confidential and that anything he said was between the investigating officer and himself. Accordingly, the ruling of the law member in admitting the statement in evidence was error as a matter of law. This, then, poses the question of whether the error was prejudicial.

In testing this it is necessary to refer to the substance of the testimony given before the investigating officer. The statement admitted in evidence consists of questions and answers and extends beyond a confession of the crime. In the first part of the questioning the accused denied having access to the examination sheets. He denied having any help and claimed his answers were based on his personal knowledge of the subject. After some 83 questions and answers he reversed himself, admitted he had falsified, and declared he wanted to tell the truth. He thereupon stated facts showing that he had cheated in the examination. The questions and answers, however, went further as the investigating officer developed misconduct as it might be measured by both cheating and giving false testimony.

One fundamental difference between civilian practice and military practice which is of importance in this instance is that in the former the jury does not ordinarily sentence the defendant, while in the military system the members of the court-martial do. In testing prejudice in military tribunals consideration must be given to the probable impact on the minds of the members of the court both as to the findings and the sentence; and if the error itself substantially influenced the court, or if there is grave doubt as to its prejudicial effect, the findings and sentence should not be permitted to stand.

Another consideration in determining prejudice to the accused is the reasonable probability of the court returning a verdict of guilty of a lesser included offense. The charge and specification

**409**

herein involved alleged an offense in violation of Article of War 95, 10 U.S.C. § 1567. The gravamen of the offense is conduct unbecoming an officer and a gentleman. However, there has been a practice in the military which permits the finding by exception and substitution of a lesser included offense under Article of War 96, 10 U.S.C. § 1568. In addition to this practice, the Manual for Courts-Martial, U. S. Army, 1949, specifically provided for such a procedure. Paragraph 78b, page 76, of that Manual states as follows:

". . . For example, in the case of an officer charged with a violation of Article 95 the court may not find him guilty of a violation of Article 96 in order to adjudge confinement, although, if the circumstances warrant, the court may properly find the accused guilty of a violation of Article 96 in such a case and adjudge dismissal or a lesser sentence. . . ."

Keeping in mind the considerations mentioned, there are at least three ways in which I believe the inadmissible evidence prejudiced the accused: (1) This was a circumstantial evidence case and the confession removed all reasonable hypotheses of innocence. It clinched the case for the Government. (2) The accused presented evidence of good character, but this was damaged or destroyed by his own testimony that he had falsified willfully under oath. (3) The possibility of the court reducing the offense by exception and substitution was lessened by the showing of perjury and the suggestions that such reprehensible conduct was unbecoming an officer and destructive of his value to the service. Particularly might this be influential when, as here, the president of the court immediately after imposing the sentence stated to the accused, "I would like further to inform you, however, that the court feels that your case merits a letter of clemency." If the members of the court were considerate of the accused I believe it reasonably probable that had the written statement not been before them they might have been inclined to reduce the offense as permitted by the Manual.

What I have previously stated applies with equal force to the sentence. Under the old procedure a lesser sentence might be imposed in a conviction of Article of War 96, supra, and under our holding in this case and in view of the applicability of the new Code, a sentence of dismissal from the service was not mandatory. It should be apparent that if an accused is cast in an unfavorable light by his own incriminating evidence of another offense, there is a reasonable probability that the nature, length and duration of the sentence will be substantially affected.

In view of the fact that the case is being reversed and may be retried, I point out another probable error which I think should not be repeated. One of the principal issues before the court-martial was as to whether or not the statement given by the accused was voluntary. The evidence touching on this matter was heard outside the presence of members of the court. The law member ruled in favor of the Government and held the confession was voluntary. However, when the court reconvened little, if any, evidence was introduced on this issue. Even after inquiry by a member of the court the evidence was not made available. The law member, in accordance with appropriate practice, instructed the court-martial that his holding on the admissibility of the document was not final, and that each member of the court could determine whether the statement was given under conditions rendering it involuntary. The instruction was apt, but was futile in view of the fact that there was no evidence on which the court could intelligently act. I would, therefore, suggest that when similar issues are tried and testimony is taken out of the hearing of the court that the evidence be brought before the court in some acceptable manner unless the accused specifically objects to its presentation.

For the foregoing reasons and because of the holding in United States v. Downard (No 226), 1 USCMA 346, 3 CMR 80, decided April 28, 1952, I concur in the holding that the case should be reversed and the matter returned to The Judge Advocate General for further action.