APRIL TERM, 1947

THE STATE OF WYOMING,
*Plaintiff and Respondent,*

vs.

LOUIS A. CATELLIER,
*Defendant and Appellant.*

(No. 2346; April 7th, 1947; 179 Pac. 2d. 203)

124

126

128

130

For the defendant and appellant, the cause was submitted upon the brief and also oral argument of Vincent Mulvaney of Cheyenne, Wyoming.

For the plaintiff and respondent, the cause was submitted upon the brief of Louis J. O'Marr, Attorney General, Hal E. Morris, Deputy Attorney General, and Frank M. Gallivan, Assistant Attorney General, all of Cheyenne, Wyoming, and oral argument by Mr. Morris.

## OPINION

BLUME, Justice.

The defendant, Louis A. Catellier, was convicted by a jury of manslaughter, for killing one Joe Paris. From that conviction and the sentence imposed upon the defendant, he has brought this case to this court by direct appeal. On account of some of the questions raised herein, it will be necessary to review the evidence. The record is voluminous, and space does not permit to give anything but an outline of the testimony, though we have aimed to set out all the vital facts.

*Primary Facts:* The primary facts herein appear from the following statement: The deceased, Joe Paris, was a Mexican of small stature, of swarthy complexion, and weighed about 145 to 150 pounds. He was approximately 60 to 65 years of age. He was a periodical drunkard. His English was very broken and it was difficult to understand him. He came to the office of the defendant in Cheyenne in the morning of October 6, 1945. He complained that he had had severe pain in his right arm and that he had not slept for the past three weeks. He wanted defendant to find out the cause. The man's arm was apparently bandaged to some extent and he said that Dr. Ramirez had given him some pills for his pain. An x-ray picture of his arm was taken and he was told to come back at 3:30 in the afternoon. The deceased came back about the time mentioned, accompanied by a Mr. Aylward, who agreed to take care of the deceased after the defendant would be through with him. The defendant asked Aylward whether the case

would be one for compensation by the State. Informed that it was not, defendant stated that he would take care of Paris anyway. No charge was ever made for what the defendant did. Another x-ray was taken. Both x-rays showed that the shoulder of the deceased was dislocated. That occurred about three weeks previously. The temperature and the pulse of the deceased was taken; his temperature was 97, his pulse 86, respiration normal and he had an empty or almost empty stomach. 3 cc's of a 5% solution of sodium pentothal, that is 15/100ths of one gram, were injected into a vein of the patient at about the center of the base of the hand or wrist of the left hand, in a period which is in dispute as hereinafter mentioned. That was about 4:45 P. M. of October 6, 1945. The patient was lying on a table on his back. He was asked to count, but understanding English very poorly, he merely mumbled. After the injection had been made and the deceased became unconscious the dislocated shoulder was reduced. Sometime thereafter, Joe Paris became cyanotic, that is to say, his color turned blue on account of want of sufficient oxygen, the defendant claiming that that took place about 5:15 P. M. But the time and cause thereof and other related facts will be stated hereafter. At any rate, by 5:30 P. M. the cyanosis had progressed to such a stage that the defendant became alarmed, fearing for the life of Paris, and not knowing what to do himself, he called a number of physicians on the telephone, but did not succeed in getting anyone to come until after he phoned to Dr. Ketchum at about 5:45 P. M. and who, accompanied by Mr. Wingo, a visitor, arrived at the defendant's office about 6 o'clock P. M. No oxygen or counter-stimulant of any kind or artificial respiration were administered to the deceased before about 6:00 P. M., and in the meantime the patient's pulse had become undeterminable. His heart, at 6:00 P. M., was beating weakly and the patient's

voluntary and reflex respiration had stopped. He was given manual artificial respiration, beginning at about 6:00 P. M. Difficulty was experienced in getting air in and out of the patient. He did not start voluntary or reflex respiration during that time. Thereupon the resuscitator of the fire department was summoned. Difficulty was encountered in inserting it into the patient's throat. He did not start voluntary or reflex respiration while this method of artificial respiration was being used. Shortly after 6:00 P. M. 2 cc's of picrotoxin was administered in a vein in the base of the hand with no noticeable result. Shortly thereafter 1 cc of adrenaline was administered intravenously, also with no effect. Between 6:45 P. M. and 7:00 P. M. the patient's heart had ceased to beat. A post morten examination of the head and trunk, thorax and abdomen was made upon the body of the patient on October 7, 1945, and the cause of death was given as respiratory failure with coronary sclerosis, moderate. The post mortem examination showed no other cause of death.

The defendant had testified at the coroner's inquest and had stated that Joe Paris had been permitted to rest awhile. That period of rest was explained by Dorothy Duncan, the attendant nurse, as meaning approximately 20 seconds, so as to determine as to whether or not the deceased had become unconscious.

As previously indicated, the defendant claimed, and testified that Joe Paris became cyanotic at 5:15 P. M. In that he was corroborated by Dorothy Duncan, the defendant's nurse, who was not a registered nurse, but who had had considerable experience in nursing, having received knowledge of the use of sodium pentothal as early as 1938, and who testified that she placed a small pillow under the deceased from about the base of the head to the middle of the back; that while the patient was lying down his head was tipped slightly back

so that it would not go forward and impair the breathing; that the patient was breathing normally from 4:45 to 5:15 P. M.; then his pulse started to get slower and he began to become cyanotic; that the deceased was all right up to that time; that she had never left him and the deceased was getting all the oxygen that was required and was breathing normally; that at 5:15 P. M. blankets were put upon the patient and hot towels were put upon his heart area so as to stimulate his heart; his color thereafter seemed to be better and his pulse became stronger, but that about 25 minutes after 5:00 P. M. Paris started to become cyanotic again, and that thereafter the defendant commenced to call the physicians, as above related. Without going into details, the testimony of Miss Duncan was substantially corroborated by the defendant.

It may be noted at this place, that at least some of the physicians who testified for the State did not accept all of this testimony as being correct. Dr. Phelps and Dr. Harris both testified that at least part of the cause of the cyanosis was the fact that the head of Paris rested on a pillow. The defendant had testified to the head so resting at the coroner's inquest, and that testimony was introduced in this case. So Mr. Wingo testified that when he arrived at the defendant's office at 6:00 P. M., the head of Paris was resting on a pillow. Furthermore, as will appear later, at least indirectly, Dr. Phelps did not accept as true the testimony that the cyanosis appeared as late as 5:15 P. M. Miss Duncan made a history chart of the case of Joe Paris. She testified that part of the chart was made in the morning and the rest of it during the evening. This history chart was introduced in evidence by the defendant. It shows that 3 cc's of 5% solution or 15/100ths of a gram of sodium pentothal was administered to the deceased in the period of 30 seconds.

The defendant had testified at the coroner's inquest that he administered this amount of sodium pentothal in 3 seconds and explained upon the trial of the case that he had misread the chart made by Dorothy Duncan on account of being too flustered at that time. Dorothy Duncan also had testified at the inquest that it had been administered during that period of time, but stated that the defendant had the chart at that time and she simply repeated what he had told; that she discovered the error during the inquest and called the county attorney the next day, after the defendant had been arrested| Dr. Ketchum testified that the defendant told him when he arrived in the latter's office about 6:00 P. M. of October 6th, that he had administered the sodium pentothal in 3 seconds.

The State obtained at the coroner's inquest the bottle of sodium pentothal used by the defendant on Oct. 6, 1945, and introduced it in evidence. It was accompanied by a pamphlet of Abbott Laboratories, which states that "the initial injection should under no circumstances, exceed 2 or 3 cc. of 5% solution * * * in 15 seconds * * * Only expert anesthetists should employ Pentothal Sodium. It is essential that the patient's chin be supported and a free airway be maintained at all times." The drug was obtained from a drug store. There is some dispute as to the time when it was ordered, but that seems to be of minor, if any, importance. So the testimony of the witness Lankas, a druggist, that Dorothy Duncan telephoned him soon after 5:30 P. M. on October 6, 1945, stating that Joe Paris seemed to be dead, need not be related in further detail, since it appears to be of minor importance.

Defendant is a chiropodist and has been since 1928. He has not been licensed to practice medicine or surgery. His professional training, according to his testimony, consisted of a two years' course at the Colorado

College of Podiatry, graduating from the school. He had one year's training at a children's hospital at Louisville, Kentucky, and three month's training at a hospital in Boston, Mass. He had taken post graduate work in the Illinois Foot Clinic in Chicago, and under the chiropodist's staff at the Mayo Clinic. He was in the U. S. Navy during the war. He then had instruction in the use of the hypodermic needle for the injection of local anesthesia; he had training in the use and administration of sodium pentothal as a general anesthetic in the U. S. Naval Hospital in California where he was employed as a pharmacist's mate, and as such was given a three month's course in the duty as such mate; two weeks of that training were devoted to the use of anesthesia. He served in the surgical ward as an assistant where general anesthesia was administered, and among other anesthetics sodium pentothal was used. He saw the administration of about 30 cases of that anesthetic. His first experience with it, according to his testimony, was two years prior to the time of the trial, and he administered it in Cheyenne. He attempted to get all the information he could get on the drug, including the information contained in a text book by Dr. Lung. He further testified that he himself had a shoulder dislocated on July 26, 1944, by being thrown off a horse; that he laid on the mountain side for seven hours and was relieved by the use of sodium pentothal as an anesthetic, and that a physician set his shoulder right there. He also stated that the pain a person has from a dislocated shoulder is excruciating, that he felt that the case of Joe Paris was an emergency, in view of the fact that he himself had suffered for only seven hours while Joe Paris had had his shoulder dislocated for a period of three weeks. This part of his testimony was stricken from the record.

*Medical testimony for the state:*

Dr. Andresen, a pathologist, testified that she made a post mortem examination of the deceased, and in her death certificate stated the cause of death of Joe Paris to be due to respiratory failure, and she found moderate coronary sclerosis; that respiratory failure means failure of the center of the brain which controls respiration. That could mean that death was due to any number of causes. She performed an examination of the head and chest and of the abdomen of Joe Paris. She did not find anything in the examination of the head. The blood vessels showed no hemorrhage, and nothing was found in the examination of the brain which showed the cause of death. She examined the blood vessels; there were no clots and no bleeding from the vessels. No microscopic examination of any kind was, however, made of the brain. She opened the chest, took off the front part of it and removed all the organs from the chest and examined them. The examination showed the lungs were normally expanded. There was no enlargement of any glands in the chest. The heart was not enlarged. The vessels of the heart showed a moderate amount of hardening, such as is commonly found in people of the age of Joe Paris. The great vessel, the aorta, which comes from the heart, did not show anything in particular, and the esophagus, the tube leading to the stomach, was empty, and the tube of the windpipe also was empty. The cavity surrounding the lungs was dry. She examined the stomach. The lungs appeared normal. She examined the muscle of the heart, took microscopic sections thereof and it showed only the changes consistent with the man's age. The organs of the abdominal cavity were all normal in position and appearance, and the stomach was empty. The kidneys looked normal. The bladder was empty. Microscopic examination was made of sections of the liver and kidneys which showed nothing of importance. The abdominal organs examined

included the liver, spleen, pancreas, the adrenal glands, kidneys, stomach and intestines.

Dr. George H. Phelps, a physician and surgeon of Cheyenne, of many years' experience, testified that he was acquainted with sodium pentothal; that this anesthetic first appeared in 1934; that he had used it several hundred times, using it probably on the average of twice a week; that it produces unconsciousness in a period of from fifteen to twenty seconds after the start of the administration; that the respiratory center is in the brain and that is the region which is mostly depressed in the use of sodium pentothal; that the respiration rate and depth is immediately slowed down and that is the main guide as to the amount of the anesthetic that should be used and the speed in which it should be given; that before giving this drug the blood pressure should be taken to be sure that the patient has no high blood pressure; that the heart should be checked and a routine examination should be made of the urine; that oxygen should be on hand and that if the respiratory rate becomes low it is advisable to give that along with the sodium pentothal; that metrazol is a stimulant of the respiratory center, acts very rapidly, and should also be kept on hand. If cyanosis appears and it is moderate then oxygen should be given. If the cyanosis is pronounced metrazol should be given. In answer to a hypothetical question he stated: "I feel that the careless and neglectful administration of sodium pentothal produced the death of this man." He also stated: "In this case the simple thing that undoubtedly caused most of the trouble was the fact that this man had a pillow under his head", evidently meaning that the deceased did not get sufficient air. The cause of cyanosis is the lack of oxygen getting to the lungs which would result from the use of sodium pentothal. The witness had seen a change of color in using that drug. He believed that if artificial respiration had

been given at the onset of the cyanosis that would probably have been all that would have been necessary. In the instant case the sodium pentothal was given too rapidly. There would be too quick a concentration of the drug, causing the respiration to slow down. Asked what, in his opinion, would be the minimum concentration of sodium pentothal in the blood stream which would produce death, he stated that no one could answer that. When asked what time would elapse from the start of the administration of sodium pentothal until death occurs, the witness stated that death usually follows from fifteen to thirty minutes following the cessation of respiration. That is the usual time in other cases. The witness had had no patient ever die from the administration of sodium pentothal. If the drug in the instant case had been given in 10 or 20 seconds and it had been given slowly and the air passage had been kept open and his chin had been held up, death, in his opinion, would not have occurred. While the witness could not state the minimum amount of sodium pentothal which would produce death, yet the reason that 15/100ths of a gram produced death in this case was that there was no other cause of death. If there had been it would have shown up in the autopsy. On cross-examination the witness stated that if the patient continued after the administration of sodium pentothal to breathe normally and to have a normal heartbeat for half an hour and then become cyanotic, his air passage must have been open, and he would give the reason for death as from something other than sodium pentothal. If the cyanosis improved with artificial respiration, the air passage would have to be open.

Dr. William D. Harris, a physician and surgeon, living at Cheyenne, Wyoming, testified that he had been in the practice twenty-two years. He has been acquainted with sodium pentothal and has used it him-

self between two and three hundred times; that the drug was first used in 1934, but it came into common use about three years ago; that sodium pentothal is not commonly used unless there is present stimulants such as oxygen, metrazol and caffeine. It is common practice to have those things present. Whether the patient would recover after cyanosis appears would depend on how much of the drug had been administered and how sensitive to the drug the patient is. The sodium pentothal is administered slowly while the reaction of the patient is watched. In answer to a hypothetical question the witness answered that the death of Joe Paris was caused by too rapid an injection of sodium pentothal and not having any preparations, that is to say, counter-stimulants, on hand when the patient became cyanotic; that death was due to the administration of this drug too rapidly administered and to gross negligence in the way in which it was given. It was the administration of the drug too quickly in conjunction with the lack of care and lack of treatment in the event something went wrong. He believed that the head of the deceased, resting on a pillow, was wrong, as it would naturally interfere with the normal breathing and freedom of air passages. The head should be back, not on a pillow. Instead of injecting sodium pentothal in 3 seconds it should have taken 30 seconds. If it is injected too rapidly it increases the concentration in the blood stream and is carried to the brain rapidly, namely in 5 or 6 seconds, and respiratory paralysis is apt to follow. He had never had any death occur from the administration of sodium pentothal, but he had seen many people almost die from it if resuscitating methods had not been on hand. It it were true that no cyanosis appeared and the patient breathed normally until 5:15 P. M., after the sodium pentothal had been administered at 4:45 P. M., he would say that the air passage was open until that time. He also testified

that no one could answer how much of a solution of sodium pentothal as a minimum would be fatal in the blood stream at one time, but that the amount administered was fatal in this case. "Q. How would you judge that, if you say nobody could say how much would be a lethal dose for the drug? A. The question was the minimum? Q. Yes. A. I don't know, it would depend on the individual." The last patient to whom he administered sodium pentothal was 3 or 4 cc. of 5% solution. He had never had a death occur in the administration of this drug, nor had he ever observed any. The witness did not know how long it would take after the drug goes into the blood stream, death would occur, if due to the drug. In his opinion the effect of the drug would not necessarily be apparent before one half hour had elapsed, because it is graduating in effect.

Dr. K. L. McShane, physician and surgeon of Cheyenne, Wyoming, testified that he had practiced medicine for thirteen years. He was acquainted with sodium pentothal and had known of it since 1936. He had used it about twice a week for the past five years. The preliminary steps accepted in practice is to determine whether the patient will tolerate that type of anesthetic. It is a dangerous type of anesthetic and the margin of safety is not as great as in other anesthetics. After assuming the patient can tolerate this type of anesthetic the administration thereof is made quite slowly until the toleration can be determined. The accepted method is a very slow administration of the drug by injection in the vein because it will very rapidly depress the respiratory center and the patient will cease breathing; counteracting measures, including metrazol, are always present when the anesthetic is given; when respiration is lacking the pillow is pulled from under the head and the head flattened down; and artificial respiration is given immediately while metrazol is given in the vein. That is necessary to be done

immediately when respiration ceases. If not given the patient ceases to get oxygen in the blood and will die from respiratory failure, paralysis. In answer to a hypothetical question he answered that the cause of death was respiratory failure caused by the negligent use of sodium pentothal and the lack of counteracting measures taken in time. The administration of the drug in a period of 3 seconds, and allowing the patient to rest was wrong, because when you let a patient rest with sodium pentothal he is unconscious and he will either become conscious within a very short time or his respiratory center will cease to function. The witness was never present when death occurred from the use of sodium pentothal and could not state the amount necessary to cause death, nor the minimum time it would take from the time of giving this drug until death occurred, if due to this drug. Sodium pentothal is rapidly eliminated in the blood stream. In the opinion of the witness, death would probably not have resulted if the drug had been administered in 30 seconds; that if, however, it had been administered in 10 seconds, he would have died; and would probably also have died if it had been administered in 15 seconds.

Dr. Philip Teal, a physician and orthopedic surgeon, was licensed to practice medicine and surgery in Wyoming in November, 1945. He was acquainted with sodium pentothal and had used it and observed its use as far back as 1938 and 1939 in Omaha. Following that he had used it many times in his own work and considerably during the time he spent in the Army, which was a little over two years, having been discharged from the Army in August, 1945. The Army used this anesthetic considerably. It was used in practically all cases of minor injury and where short durations of muscular relaxation were necessary. He observed the use of sodium pentothal between 700 and 1000 times. He stated that in a case where a man has had a shoul-

der dislocated for three weeks it is practically impossible to put it back unless the muscles are completely relaxed. It would practically be impossible to get the muscular relaxation with sodium pentothal necessary in order to reduce the dislocation. Hence in the opinion of the witness Joe Paris died following the injection of sodium pentothal, before the shoulder was set. He did not believe that the patient's head was in the proper position for the passage of air, and that death was due to the injection of sodium pentothal and because no stimulants were present and no artificial respiration was given immediately, and that there could not be any other cause of death in this particular case. The opinion of the witness that Joe Paris may have died very shortly after the injection was based on the rapidity of the injection. In the Army it is recommended that only half of the solution used in this case should be used because of the danger of too high a concentration. He could not state the minimum amount of sodium pentothal administered to a patient which would cause death and no one could answer that; that it would depend on the patient; it is a question that has no answer; that a lethal dose of this drug is not established by pharmacopoeia. He stated that 1 cc. could be a lethal dose, depending upon the patient and how he tolerates the drug and the speed with which it is given. He did not know the answer as to how quickly it is dissipated in the blood stream and no one else does; that unless the drug is given in a large amount the patient recovers from the drug very rapidly. The witness had used sodium pentothal in a case of a dislocated shoulder. He had seen three deaths due to sodium pentothal, but he did not recall how soon after the administration of the drug death occurred, nor how rapidly the drug was administered in these cases. Based on his experience death could occur within 3 seconds to an hour after the drug is given. In one death which

witness observed, the patient died as a result of too rapid administration. The patient very shortly developed a spasmodic contraction of the windpipe; his breath started whistling, and in a very short time he expired.

*Medical testimony for defendant:*

Dr. Stein of Denver testified on behalf of the defendant. He is a physician and graduate of the University of Colorado School of Medicine, and is licensed to practice in Colorado. He is a member of the American Medical Association and a member of two societies of anesthetists and connected with a number of hospitals in Denver. He was admitted to practice medicine in 1925 and went into the Army in 1942, where he was the head authority for giving anesthetics. He was responsible for all such anesthetics given and for the training of the nurses and enlisted men assigned to him for that purpose. His post graduate work in addition to his general practice, especially in the use of sodium pentothal, was at the Colorado General Hospital, and at Johns Hopkins at Baltimore while he was in the service. He had used sodium pentothal in his own practice since it came out and found that it supplanted any other anesthetic which they were using in the armed service. After the doctor left the United States and went to New Caledonia he gave it in perhaps one thousand cases. His practice is now limited to anesthesia in Denver. In answer to a hypothetical question, he stated that if Joe Paris was given sodium pentothal in the amount of 15/100ths of a gram, he could say that the drug could not have caused the death of the patient. There is no case on record or in the textbooks that sodium pentothal affects the heart as such, or that so small a dose produces death. The witness had never in his experience given so small a dose. The time element, that is the rapidity of injection, is not important in the

administration of sodium pentothal in a 5% solution where the quantity is only 3cc's. In the experience of the witness in this type of work he invariably gives the first injection as rapidly as he can push on the syringe to inject it. The reason such an injection would not be dangerous for 3 cc's in a 5% solution as used is that it is too small an amount. It is an infinitesimally small dose. The drug passes up the arm and mixes with the blood, then it goes to the heart and mixes with the blood coming from other parts of the body, both upper and lower. Then after it mixes in the heart it is sent to the lungs where it is mixed with more blood. The amount of blood in the body is approximately six or seven quarts and it becomes diluted very quickly. It is distributed evenly throughout the body very quickly and the anesthesia is effected by depressing the nerve tissues, but such a small quantity as above mentioned, since the blood is constantly circulating, is destroyed in the blood stream immediately. Age does not prevent the use of sodium pentothal unless above or below the extreme limit. He had administered this drug to a patient 92 years of age. With properly selected cases, considering the condition of the patient, sodium pentothal is the safest anesthetic that can be used. The witness did not consider it necessary to have an oxygen tank available in the type of operation such as appears in this case. It is the proper anesthetic to use in the reduction of a shoulder as appears in the case at bar. The doctor never stopped with that small an amount in any administration of sodium pentothal for this type of operation. In his opinion Miss Duncan was competent to prepare the drug and the defendant was, in his opinion, competent to administer it in the amount used in this case. If an overdose of sodium pentothal is administered it should be apparent in the patient within a matter of seconds after the injection. If a patient dies from sodium pentothal he would die within 10

minutes after the solution was injected. That would be the maximum time. There never was a case where a person has been resuscitated who has not breathed or has not had air in his lungs for a period of over 10 minutes. 15/100ths of a gram will not cause a patient to become cyanotic 25 or 30 minutes after the administration thereof. If the anesthetic had been given at 5:00 o'clock and cyanosis became noticeable at 5:15 that still would be true. It could not have been caused by sodium pentothal because the effect of 15/100ths of a gram would be worn off and the patient would be able to breath. It would be different if cyanosis had appeared in the first 10 minutes after the administration of the drug. In his cross-examination it appeared that in the pamphlet of Abbott Laboratories, which put out this drug, it is recommended that it should be used only by an experienced anesthetist, or surgeon, who has facilities at hand to combat problems of respiratory depression, and that the initial injection should not exceed 2 or 3 cc's of a 5% solution in 10 or 15 seconds. The pamphlet was written in 1936, and for that reason the witness did not agree with it, since the main use of the drug has been since that time. A later pamphlet issued by the same company states that the initial injection should not exceed 2 or 3 cc's of a 5% solution in 10 or 15 seconds. The pamphlet was written in 1936, and for that reason the witness did not agree with it, since the main use of the drug has been since that time. A later pamphlet issued by the same company states that the initial injection should not exceed 2 or 3 cc's of a 5% solution in 15 seconds. The witness recognized, however, that the use of it might be dangerous, and that the free use of oxygen before and during the operation is important, as the witness stated in an article written by him. Witness had never given artificial repiration to a patient under sodium pentothal anesthesia. In a respiratory death, the respiration ceases and the heart

continues, but only for a matter of minutes, about 10 minutes.

The deposition of Dr. Ben Morgan of Chicago was taken on behalf of the defendant and read in evidence. The doctor is a graduate of Loyola University, graduating in 1914; is licensed to practice medicine in three states; he is a member of a number of societies of anesthetists; he had 30 years' experience, specializing and teaching anesthetics in hospitals and lecturing in practically all the larger hospitals in the United States. He had made research work in all the newer drugs, including sodium pentothal. He had used this drug from the time it became available to the present time, covering about 6 years. During this time he used this drug for every type of operation and physical condition, and on all ages of patients from six weeks to ninety-four years. He has taught students and interns in a number of hospitals. He personally has administered and used sodium pentothal as an anesthetic between 6000 and 7000 times, over a period of six years. In his opinion the administration of sodium pentothal to Joe Paris, under the facts in this case, had nothing to do with his death. He stated that, in his experience in the administration of this drug, to many hundreds of patients, the time of injection, that is to say the rapidity thereof, is of no importance, but that the amount of the sodium pentothal in the blood stream at any one given time is the important point. It requires 7/10th of a gram—about one-half of a lethal dose—to anesthetize an average patient weighing 150 lbs. in average physical condition, for the start of a major operation. 15/100ths of a gram is not sufficient to produce more than a most superficial anesthesia. The fact that respiratory failure was given as the cause of death with coronary sclerosis would not show that sodium pentothal was the cause of death. The time element, that is the administration of 3 cc's of a 5% solution of this drug in 3 seconds, had no effect

whatever in causing the death of the patient because the quantity used was too small. In his experience, seeing a number of cases of death from the administration of sodium pentothal, the length of time in which death occurs after the administration of this anesthetic, when death is due thereto, is 10 minutes. His testimony to the effect that he had observed 35 deaths after the administration of sodium pentothal and that breathing was never restored after it had once stopped, was not permitted to be read to the jury. Under the facts in the present case as related to him, it was not essential, in the opinion of the witness, that oxygen should be present. But it is essential when airways are obstructed. He would require other precautionary measures, such as the usual heart and circulatory stimulants. The witness stated that the precautionary measures that must be taken are (1) Pulse, respiration and temperature. (2) Breathing must be approximately normal as to rate and volume. (3) Respiration tract should be free from obstruction. (4) Knowledge of artificial respiration. (5) Sterile equipment. Among advisable precautions are heart and circulatory stimulants.

*Medical testimony on other possible causes of death:*

Counsel for defendant sought to show on cross-examination of some of the witnesses for the prosecution that coronary sclerosis, and ventricular fibrillation as a result thereof, might have been the cause of the death of Joe Paris. Coronary sclerosis was explained as being the hardening of the arteries of the heart. Fibrillation means an irregularity. Ventricular fibrillation exists when the heart beats irregularly and flutters along, and as a consequence disturbs the pulse. Dr. Phelps stated that ventricular fibrillation could occur and would not show up in an autopsy. Moderate coronary sclerosis is present in most individuals and would not produce any trouble unless it reaches the point

where it closes off the artery which supplies the heart muscle. He repeated that, in his opinion, Joe Paris died as previously stated by him. Dr. Harris stated that ventricular fibrillation might never show up in an autopsy. It might come and go. At the time when the pulse might be examined it might be normal and it might cause death without any warning. Dr. McShane stated that certain degrees of ventricular fibrillation cannot be observed with microscopic examination, and that a patient with that condition might be normal in appearance, having a normal pulse rate and temperature and still fall over dead any moment or die from the least provocation. He did not, however, think that Joe Paris died as a result of coronary sclerosis or ventricular fibrillation, saying "as stated before, the gross examination of the heart did not reveal more than normal coronary sclerosis and no clot. The microscopic examination did not reveal sclerosis or changes in the heart muscle which would be present if he died from ventricular fibrillation which would be due to the heart condition." A mild sclerosis is not a dangerous condition in a man 60-70 years of age without symptoms. In Dr. Teal's opinion, the deceased did not die from a heart condition, because his breathing ceased, while his heart continued to beat. Dr. Andresen stated that she too did not think that coronary sclerosis was the cause of death, but merely a condition which was present. The reason is that there was not enough of it.

Dr. Stein testified on behalf of the defendant, stating that he could not be positive of the cause of the death of Joe Paris because he was not there, but he stated that in his opinion cerebral hemorrhage, or coronary thrombosis, (blood clot), or sudden ischemia, meaning the deprivation of oxygen in the heart muscle, may have caused the death. If Joe Paris had hardening of the arteries he would also have it of the brain. The cause of death of people of sixty years of age is most fre-

quently cerebral apoplexy or rupturing of the vessels of the brain, and in his opinion one of those two could have caused the death of Joe Paris.

Dr. Teal, in rebuttal, stated that in his opinion Joe Paris did not die of cerebral hemorrhage. If he had, the autopsy findings would have revealed it. An area of blood the size of a nickel or quarter would have appeared, noticeable by a "gross examination", by which is evidently meant "without microscopic examination". Nor in his opinion did Joe Paris die of coronary thrombosis since there was no evidence in the autopsy findings to indicate sufficient pathological changes in the coronary artery to cause that kind of death. Nor, in the opinion of the witness, was there enough evidence of death from sudden ischemia. The testimony of Dr. McShane was similar. Other incidental facts will be mentioned hereafter.

*I. Sufficiency of the Information.*

The information in this case is as follows: "Comes now, Edward Byron Hirst, County and Prosecuting Attorney of the County of Laramie, in the State of Wyoming, and in the name and by the authority of the State of Wyoming, informs the Court and gives the Court to understand that Louis A. Catellier, late of the County aforesaid, on the 6th day of October, A. D. 1945, at the County of Laramie, in the State of Wyoming, did unlawfully and feloniously kill Joe Paris in the commission of an unlawful act or by culpable neglect or criminal carelessness, to wit: said Louis A. Catellier then and there did administer to Joe Paris the anaesthetic, Pentothal Sodium, Louis A. Catellier not being a person qualified or licensed to administer Pentothal Sodium, and Louis A. Catellier did then and there administer Pentothal Sodium to Joe Paris with culpable neglect or criminal carelessness thereby killing Joe Paris, contrary to the form of the statute in such case

made and provided, and against the peace and dignity of the State of Wyoming."

Counsel contends that this information does not charge the defendant with any crime. Sec. 10-705, Wyo. Compiled Statutes of 1945, states that "in any indictment for manslaughter, it shall be sufficient to charge that the defendant did unlawfully kill the deceased." We held in State vs. McComb, 33 Wyo. 346, 239 Pac. 526, 41 A. L. R. 717, that it is sufficient to charge the defendant in the language of the foregoing statute. The information in this case substantially contains these allegations. It then states that the killing was done in the commission of an unlawful act or by culpable neglect or criminal carelessness. The statement is in the disjunctive, which counsel says indicates that the information is too indefinite. It is a well settled rule of law that when an offense against a criminal statute may be committed in one of several ways, the information may, in a single count, charge its commission in any or all of the ways specified in the statute. 42 C. J. S. 1120; Thompson vs. State, 41 Wyo. 72, 283 Pac. 151. Whether the charge should have been in a conjunctive need not be determined. See 42 C. J. S. 1036. However, Sec. 10-703, Wyo. Compiled Statutes of 1945, provides that an indictment shall not be deemed insufficient for any surplusage or repugnant allegation when there is sufficient matter alleged to indicate the crime or person charged, nor for any defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits. Surplusage is defined in 42 C. J. S. 1088, as any allegation without which the pleading would remain adequate in law, which would seem to indicate that the provision that Joe Paris was killed in the commission of an unlawful act or by culpable neglect or criminal carelessness is surplusage. But even if it is not, no motion to quash or demurrer was filed, and we do not think

that under the circumstances the substantial rights of the defendant were prejudiced.

The further provision of the information states the manner in which the deceased was killed. Counsel claim that this is not surplusage. We need not determine that. This part of the charge leaves out the provision that the deceased was killed in the commission of an unlawful act, and in that respect adopts the theory on which, in the reported cases, defendants practicing medicine without a license have almost been uniformly tried in case of the death of a patient, as will be shown hereafter. The information at this place does not charge the defendant in a disjunctive manner; it states that Joe Paris was killed with culpable neglect or criminal carelessness. These terms, as shown in State vs. McComb, supra, are synonymous, and in such case the charge is not deemed to be in the disjunctive. 42 C. J. S. 1036. Counsel for the defendant argues that the defendant is not charged with violating the law relating to chiropody or that relating to medical practice, and that the defendant, in setting the shoulder of Joe Paris, did not treat the deceased under the chiropody act; that an anesthetic is not forbidden to be administered by a layman. We shall consider these matters in more detail below. Suffice it to say at this place that any person, no matter in what capacity he may act, is guilty under the statute of manslaughter if he involuntarily kills a person with criminal negligence, for Sec. 9-205, Wyo. Compiled Statutes of 1945, provides: "Whoever unlawfully kills any human being * * * involuntarily, but * * * by any culpable neglect or criminal carelessness, is guilty of manslaughter * * *." That the defendant so killed Joe Paris seems to be charged in plain and ordinary language. The facts are set out, and it is difficult to see what addition should have been made to it. See Silver vs. State, 13 Ga. App. 722, 79 S. E. 919. It was sufficient to apprise the defendant with reason-

able certainty of the nature of the accusation so that he would be enabled to avail himself of his acquittal or conviction as a protection against further prosecution for the same offense. See State vs. Karsunky, 197 Wash. 87, 84 Pac. 2d 390; 40 C. J. S. 1029, 1063. We think that we must overrule the error assigned by the defendant in this connection.

## II.  Defendant's testimony at coroner's inquest.

The defendant testified at the coroner's inquest, and, over the objection of his counsel, the testimony was admitted in the trial of this case. That is assigned as error herein. The defendant at the coroner's inquest was examined by the prosecuting attorney who, after a few innocuous questions, stated: "Incidentally, I forgot one thing which applies to all witnesses. No witness has to testify unless he wants to, although you would have to give some reason for not testifying. Any statements made are voluntary and anybody who makes a statement should make a responsible statement. Any person making such statement will be bound by what he says and it can be used against him in any court action or anything of that nature. You understand do you, Dr. Catellier, and all of you witness do, is that correct?" The defendant answer "Yes."

In the case of Maki vs. State, 18 Wyo. 481, 112 Pac. 334, this court held that where a person was under arrest, while examined at a coroner's inquest, and without due warning to him, his statements at such inquest were not admissible against him. In the case at bar, the defendant was not under arrest at the time of the coroner's inquest and while the form of the warning given him is probably not to be commended, yet he was informed that he did not need to testify and that the evidence he gave might be used against him. Counsel rely, among other cases, on State vs. Allison, 116 Mont. 352, 153 Pac. 2d 141; State vs. Rixon, 180 Minn.

573, 231 N. W. 217, 68 A. L. R. 1501; and State vs. Meyer, 181 Iowa 440, 164 N. W. 794, but these cases have distinguishing features. In the Montana case, for example, it appeared that the defendant was compelled by the prosecuting attorney to testify while he was under the influence of liquor, or while he was scared. No such compulsion appears in the case at bar; nor was such compulsion claimed by the defendant when he testified in this case. A number of cases hold that an important admission by an accused against himself, will not be admitted, unless it is first shown by the state to have been voluntary. 22 C. J. S. 1251. The majority rule seems to be to the contrary in cases in which defendant was not under arrest at the time of the admission. 20 Am. Jur. 474; State vs. Masato Karumai, 101 Utah 592, 126 Pac. 2d 1047, and see Strand vs. State, 36 Wyo. 78, 84, 252 Pac. 1030. A lengthy annotation on the testimony given at the coroner's inquest will be found in 70 L. R. A. 33-48. See also Annotation in 12 Ann. Cas. 161. Without mentioning the details, these annotations do not indicate that we should reverse the judgment in this case on account of the contention here made by counsel.

The testimony given by the defendant on the trial of this case is not a great deal different from the testimony which he gave at the coroner's inquest except in one particular. At the coroner's inquest he testified that he administered the sodium pentothal in 3 seconds; in the trial of this case he testified that he misread the chart made by his nurse, Dorothy Duncan, which stated that it was administered in 30 seconds instead of 3 seconds, and that it was in fact administered in 30 seconds. However, he told Dr. Ketchum, as appears in the record herein, that he administered the drug in 3 seconds. He did that while Joe Paris was dying, and at a time and under circumstances which made it appear probable to the jury that he told the

truth. No chart had at that time been made, as we understand the testimony of Miss Duncan. In view of these facts his testimony given at the coroner's inquest was but corroborative of what he had told Dr. Ketchum. We think we should conclude that to admit the testimony was not prejudicial error. We must not, however, be understood as sanctioning a procedure by which a person is substantially compelled to furnish some of the basic evidence on which an intended prosecution is to be founded. See Annotation 66 A. L. R. 1503.

*III. Testimony as to the pain of another.*

The defendant in this case testified that in July 1944 he fell off a horse; that his shoulder was dislocated, and that he lay on a mountain for several hours before relief was brought. He was then asked whether the dislocation of the shoulder is painful, and he answered, "It is very excruciating, the pain you have from a dislocated shoulder." The prosecuting attorney moved that the answer be stricken because the defendant was not an expert and not qualified to testify. The court struck out the testimony. This is assigned as error.

Counsel has cited us to no authority. He claims that in view of the contention of the defendant that he performed the operation on Joe Paris gratuitously and in an emergency the foregoing testimony was of great importance. It is, of course, common knowledge that a man who has a dislocated shoulder will continue to have pain and discomfort until the injury has been remedied. The jury knew that fact without testimony on the point. And considering the uniformity of the human system and the ills that flesh is heir to, it may be, without deciding the point, that a person who has had his shoulder dislocated is as competent as any physicion, or even more so, to testify to the pains at

the time of the dislocation and to the intensity thereof. The trouble is that the record fails to show what, if any, bearing this has on the case at bar. Joe Paris was operated on three weeks after his shoulder was dislocated. It is common knowledge, we think, that pain in many instances may become dulled, and while excruciating in the beginning, may not be so three weeks thereafter. At least we cannot take judicial notice of its continuance with the same intensity, and the record is silent on the point. From the information now before us, we are unable to hold that the ruling of the court was prejudicial error.

*IV. Medical treatises.*

The following questions and answers contained in the deposition of Dr. Morgan, a witness for the defendant, and propounded to him on direct examination, were, over the objection of the prosecution, not permitted to be read to the jury, and this is assigned as error: "Q. Have you seen and read an article on 'Sodium Pentothal Anaesthesia' by Herman B. Stein, M. C., of Denver, in the Rocky Mountain Medical Journal for December 1945? A. Yes. Q. In this article appears the statement: 'The age of the patient, excluding the very young, offers no contraindications to the use of pentothal'. Do you agree with this statement? A. Yes. Q. On page 939 of this same article appears the statement: 'In orthopedics pentothal is useful for upper extremity surgery. In Nicola operations on recurrent dislocation of the shoulder it is most useful.' Do you agree with this statement? A. Yes. Q. On Page 941 of this same article appears the following statement: 'In conclusion it has been found that sodium pentothal is an unusually safe anaesthetic.' Do you agree with this statement? A. Yes."

We discussed the question relating to the admission of medical treatises in the case of State vs. Goettine,

(Wyo.) 158 Pac. 2d 865, where we did not find it necessary to decide the matter. A complete discussion of the subject is contained in Wigmore on Evidence, 3d Ed., pages 2 to 22. Whatever may be the true rule in other cases, the court did not, we think, commit an error on this point in this case. Counsel could have elicited the testimony which he wanted to bring out by direct questions to the witness without reference to the article by Dr. Stein. That article cannot, at this time at least, be considered as a standard text. It was written but recently and on a subject of recent discovery. Dr. Phelps indicated that Dr. Stein was an authority on the subject of sodium pentothal; Dr. Harris and Dr. McShane indicated the contrary. The manner in which the questions put to Dr. Morgan were framed indicates that counsel merely sought to corroborate the article of Dr. Stein, who was a witness in this case. Counsel for defendant has not cited us to any authority to bear out his contention. The liberal view expressed in the treatise of Dr. Wigmore does not, so far as we can find, sustain him. It has been held that a physician on cross-examination may be asked whether or not he agrees with a certain author, but this may only be done on cross examination and merely as a means of testing the knowledge of the witness. Connecticut Mutual Life Insurance Company vs. Ellis, admr., 89 Ill. 516; Scullin et al. vs. Vining, 127 Ark. 124, 191 S. W. 924; Feige vs. State, 128 Ark. 465, 194 S. W. 865; Wharton & Stille's Medical Jurisprudence, 3, 597. We think the assignment of error in this connection must be overruled.

*V.   Practice of Medicine—Anesthetics—Instructions.*

The court in one of its instructions embodied the statute defining the practice of medicine including therein the provision (which defendant wanted brought to the attention of the jury in one of the requested instructions, namely) that the statute shall not be con-

strued to prohibit gratuitous service in the case of an emergency, according to Sec. 37-2013, Wyo. Compiled Statutes of 1945. In another instruction the court set out the statute defining chiropody, namely, Sec. 37-601, Wyo. Compiled Statutes of 1945. These two instructions may be considered together, and the giving thereof is assigned as error, because, among other reasons, defendant was not charged with the violation of these statutes. Chiropody is by the statute defined, briefly, as a treatment of the feet. A number of limitations are stated as to what a chiropodist may do. Among other things, the statute provides that it must not be construed to "confer the right to use any anesthetic other than local." That is equivalent, we think, to a provision that a chiropodist must not give a general anesthetic. Counsel for the defendant contends that this provision has no application in the case at bar since defendant was not, in trying to set the shoulder, acting as a chiropodist, but merely acting as an individual. It hardly sounds plausible that the intention of the statute can be evaded by the defendant attempting to make a dual personality out of himself. We think that he violated the provisions of the statute concerning chiropody, although we do not find any penalty provided in that particular statute which would apply in the case at bar. To strengthen his contention, counsel asserts that "there is no provision under the Wyoming law against a layman giving a general anesthetic", and he, in fact, asked the court to give an instruction to that effect which the court refused to do. We are not prepared to agree with counsel's assertion. As already indicated, the act regulating chiropody in effect says that a man who has only the limited education of a chiropodist in the treatment of human ailments—and he has some—is not competent to give a general anesthetic. Then to assert that the law meant to open the door for every person as an individual to give a general

anesthetic, whether he has any education at all or not in the treatment of human ailments, sounds rather inconsistent. The fact that a chiropodist may not administer a general anesthetic clearly indicates that under our statute the administration thereof is intended to be left to a person with greater knowledge of the frailties of the human system. We think we may take judicial notice of the fact that the administration of a general anesthetic may entail danger to a patient. If evidence is needed, the testimony herein of the witness Dr. Morgan and the record before us furnishes an abundance thereof. And counsel's citation from Boyd on Pathology of Internal Diseases is to the same effect. We should hate to be the cause, in whole or in part, of any person finding himself in a plight, such as that of the defendant herein, as a result of our holding that anyone may administer a general anesthetic. In the case of Frank vs. South, 175 Ky. 416, 194 S. W. 375, Ann. Cas. 1918E, 682; Chalmers-Francis vs. Nelson, 6 Cal. 2d 402, 57 Pac. 2d 1312, the court held that a graduate nurse who administers an anesthetic under the direction and supervision of a physician and surgeon is not engaged in the practice of medicine, but the cases as a whole indicate that the administration thereof is a part of the practice of medicine, and we think that that is the general understanding. The practice of medicine, in its broadest sense, is the art of healing disease and preserving health, and the license to practice medicine or surgery generally entitles the licensee to practice medicine or surgery in all the various branches and to use any method for treatment and healing human ailments, although others may be authorized to practice in limited fields of the general practice. 41 Am. Jur. 151. See also Herzog, Medical Jurisprudence, Sec. 111. In People vs. Johnerson, 49 N. Y. S. 2d 190, 196, the court said: "It has always been considered that the practice of medicine means and includes the practice

of any of the so-called healing arts. The legislature, in enacting a broad and comprehensive statute, intended thereby to protect the members of the public from untrained, unskilled and inefficient practitioners in any healing art. It is immaterial what method is used to effect a cure, or to relieve a person of pain. The true test is whether or not an attempt has been made by some manner or means to effect such cure to relieve a person from some pain or ailment or physical condition complained of." In the case of Underwood vs. Scott, 43 Kans. 714, 23 Pac. 942, it appears that in that state unlicensed persons were forbidden to practice medicine without defining the term. The court said: "The practice of medicine may be said to consist in three things: First, in judging the nature, character, and symptoms of the disease; second, in determining the proper remedy for the disease; third, in giving or prescribing the application of the remedy to the disease." In the case at bar the defendant did all three of these things. The administration of an anesthetic in connection with the setting of the shoulder was, we think, part of the remedy applied by him. Sec. 37-2007, Wyo. Compiled Statutes of 1945, defines the practice of medicine. Any person shall be regarded as engaged therein "who shall suggest, recommend or prescribe any form of treatment for the intended palliation, relief or cure of any physical or mental ailment of any person with the intention of receiving therefor, either directly or indirectly, any fee, gift or compensation whatsoever." In Joyner vs. State, 181 Miss. 245, 179 So. 573, 115 A. L. R. 954, it appears that the statute in that state provided: "The practice of medicine shall mean to suggest, recommend, prescribe, or direct for the use of any person, any drug, medicine, appliance, or other agency, whether material or not material, for the cure, relief, or palliation of any ailment or disease of the mind or body, * * * after having received, or

with the intent of receiving therefor * * * compensation." The statute would seem, in effect, to be substantially like that in this State. It was held in the foregoing case that an anesthetic (local, in that case) used by a chiropractor for compensation, in taking out a tonsil was in violation of the law prescribing the practice of medicine. So we think that in the case at bar the defendant violated the statute of this State which defines the practice of medicine, unless the shoulder was set and the anesthetic was given under the permissive condition contemplated in the statute.

True, the defendant was not prosecuted for practicing medicine without a license or for violating the statute relating to chiropody, but it would seem (though Feige vs. State, 128 Ark. 465, 194 S. W. 865, seems to hold otherwise) that the jury had the right to take into consideration the fact that the defendant was not a licensed physician or surgeon, in determining at least, whether or not the defendant was guilty of criminal negligence. That is clearly indicated in Barrow vs. State, 17 Okl. Crim. 340, 188 Pac. 351, 9 A. L. R. 207; Regina vs. Crook, 1 F. & F. 521, 175 Eng. Rep. 835; Simpson's Case, 1 Lewin 172, 168 Eng. Rep. 1002; Webb's case, 2 Lewin 196, 168 Eng. Rep. 1127, 1131; Rex vs. Burdee, 115 L. T. N. S. 904. For a person who has sufficient knowledge to justify expectation of success to undertake to cure human ailments is one thing; for a person without sufficient knowledge to do so is another. Physicians and surgeons must, under Sec. 37-2004, Wyo. Compiled Statutes of 1945, take an examination on the subject of toxicology—the science of poisons. Anesthetics, such as chloroform, ether, cocaine, have been treated in the textbooks as part of the subject of toxicology. Vol 4 Witthaus & Becker, Medical Jurisprudence, Forensic Medicine and Toxicology; Vol. 2, Wharton & Stille's Medical Jurisprudence; Herzog, Medical Jurisprudence. See also 49 C. J.

1043, Note 1. So in a broad sense at least, the study of anesthetics appears to be included in the subject of toxicology, our statute thus indirectly recognizing the study thereof as coming within the general field occupied by physicians and surgeons. Even aside from that physicians and surgeons may, we think, be presumed to have knowledge of the subject of anesthetics, ordinarily justifying expectation of success in the administration of anesthetics. No such presumption may be indulged in in the case of persons merely possessing the knowledge of a chiropodist, who is not required to take any such examination as above mentioned, and who accordingly presumptively takes a greater risk when he administers a general anesthetic, and that greater risk may, in the judgment of the jury, be unjustifiably undertaken under the circumstances of a particular case. Hence the jury was, we think, entitled to know that the defendant was not a licensed physician or surgeon. Furthermore, the fact that defendant was not a licensed physician or surgeon, but was only a chiropodist, appears from his own testimony, so that in that respect the instructions here discussed merely told the jury a fact already before them. We accordingly think that the defendant was not prejudiced thereby.

*VI. Instruction on practicing medicine—unlawful act.*

The defendant asked the court to give the following instruction:

"The defendant is not charged with the crime of practising medicine without a license, and even if you believe from the evidence that at the time in question the defendant may have been practising medicine without a license, this fact will not sustain a conviction of the crime charged in the information."

The court refused to give this instruction, and gave no like instruction. Error is assigned.

The requested instruction is so comprehensive that it calls for a fuller investigation, than already made, of the bearing which the practice of medicine has on the case. Such practice without a license as defined by statute is an unlawful act within the broad meaning of the term "unlawful act", and is penalized by Sec. 37-2014, Wyo. Comp. Statutes of 1945. Whether or not if death ensues in violating the statute, a defendant is also guilty of manslaughter merely by reason of such violation is another matter. Under Sec. 9-205, Wyo. Comp. Statutes of 1945 involuntary manslaughter consists of unlawfully killing a human being (1) in the commission of an unlawful act or (2) by culpable negligence or criminal carelessness, the latter two terms being synonymous. State vs. McComb, supra; State vs. Lester, 127 Minn. 282, 149 N. W. 297. So we may consider that the statute so far as applicable here, deals with the commission of an unlawful act and with criminal negligence. Criminal negligence is itself, of course, an unlawful act. The cases are not uniform as to what unlawful act aside from such criminal negligence makes a person guilty of manslaughter, should death ensue. In many, if not most, instances courts have refused to interpret the term "unlawful act" literally, and have made an additional requirement, as, for instance, that the unlawful act must be malum in se. See 40 C. J. S. 920-924; 26 Am. Jur. 285-286; 87 University of Pa. Law Review, 828. Quite a number of authorities, confronted with a situation similar to that in the case at bar, have substantially identified the unlawful act relied on with criminal negligence, apparently on the theory that it is in itself laudable for one to undertake to cure the ailments of another, and so they have shrunk from making a felon out of one who merely through some mishap should fail in his undertaking, and have his patient die at his hands. See annotations as to unlicensed persons to practice medicine in 61 L.

R. A. 287, 289, 9 A. L. R. 212, and see 29 C. J. 1158; 40 C. J. S. 928-929. In People vs. Cole, 219 N. Y. 98, 113 N. E. 790, L .R. A. 1917 C 816, the court said that "practising medicine, when unaccompanied by acts that are in themselves evil, vicious, and criminal, is not a crime at common law. Practicing medicine is not malum in se." Lord Hale in 1 Hale's Pleas of the Crown, 429, stated, in referring to mishaps in practicing medicine, that while physicians and surgeons not properly licensed may be subject to penalties prescribed by statute for unlicensed physicians and surgeons, yet "God forbid that any mischance of this kind should make any person not licensed guilty of murder or manslaughter." Blackstone 4 Comm. 197 approved. The holding was followed in Rex vs. Van Butchell (1829) 3 Car. & P. 629, 172 Eng. Rep. 576, and in Rex vs. Long (1830), 4 Car. & P. 398, 172 Eng. Rep. 756. In the Long case and in Rex vs. Williamson, 3 Car. & P. 635, 172 Eng. Rep. 579, it was held that a person practicing medicine or surgery whether licensed or not can be held guilty of manslaughter only if he has been guilty of criminal negligence. According to 20 Halsbury's Laws of England, 335, (1911), that is still the law in England. Gross ignorance of the art, however, is sufficient to bring a defendant within the rule. Webb's Case, 2 Lewin 196, 166 Eng. Rep. 1127, 1131; Rex vs. Burdee (1916) 115 L. T. N. S. 904. In Regina vs. Pollock, 1 F. & F. 519, 175 Eng. Rep. 835, decided in 1859, the court in charging the jury stated in part: "It is no crime for any one to administer medicine, but it is a crime to administer it so rashly and carelessly as to produce death; and in this respect there is no difference between the most regular practitioner and the greatest quack. * * * If the prisoner had been a medical man I should have recommended you to take the most favourable view of his conduct, for it would be most fatal to the efficiency of the medical profession if no one could

administer medicine without a halter round his neck; and although I cannot speak of a person in the prisoner's position in language as strong, still he ought not to be responsible unless it has been proved with reasonable certainty that he caused the death by the careless administration of the drug."

We have found no American authority directly contrary to the law in England, unless it be the dictum of Chancellor Walworth in March vs. Davison, 9 Paige 580, 587 (which deals with another subject) to the effect that if a person not licensed as a physician should undertake to treat a patient, and in doing so should kill him, he would *probably* be guilty of manslaughter. In the early days in this country there were no licensed physicians or surgeons. No statutes existed on the subject so that while the cases decided in this country at that time approved the statement of Lord Hale generally, they can hardly be said to be directly in point herein, although I Warren on Homicide, P. 167, undertakes to lay down the rule: "Nor is a person who assumes to act as a physician and administers medicine to a person with honest intention and expectation of a cure, criminally liable for a death caused thereby." See also Bishop, Criminal Law (9th Ed. - 1923) Vol. 1, Page 224; Vol. 2, Page 504-506. Brill, Cyc. of Criminal Law, Vol. 2, Sec. 675, (1923) after stating the rules applying to licensed physicians in causing the death of a patient, states that "by the weight of authority, the same rules apply to one who assumes to act as a physician or surgeon without being regularly licensed." Wharton, Criminal Law (11th Ed. - 1912), Vol. 1, Sec. 489, states: "No difference between licensed and unlicensed practitioner. It was at one time held in England that persons not graduated and licensed as physicians are to be held to a severer accountability than persons who are so graduated and licensed. But the law now is, that the want of a degree * * * adds nothing to

the grade of offense where there is no deceit, if there be a bona fide and honest attempt by the defendant to do his best, and if he possesses skill and knowledge requisite for the position he claims." In Hampton vs. State, 50 Fla. 55, 39 So. 421, licensed and unlicensed physicians seem to be placed on the same footing. The case deals with a licensed physician. In the later case of State vs. Heines, 144 Fla. 272, 197 So. 787, in which it appears that a chiropractor attempted to treat a patient for diabetes, the court, after citing Hampton vs. State, supra, and other cases, said: "It is clear from the Florida case that it is unimportant whether the person charged is a licensed physician or 'merely assumes to act as such', the real question being the presence or absence of criminal negligence." The case of People vs. Hunt, 26 Calif. App. 514, 147 Pac. 476, involves an operation by an osteopath, but in that case what the court said was in connection with the question of saving life. In State vs. Karsunky, 197 Wash. 87, 84 Pac. 2d 390, the court, without discussing the term "unlawful act", held that a person not licensed to practice medicine and treating a patient for diabetes, was guilty of manslaughter if his treatment was with criminal negligence, although in that case the defendant was also found guilty on a separate count for practicing medicine without a license. One section of the statutes of Arkansas made it a crime for a person to practice medicine without a license. Sec. 8248, Arkansas Statutes of 1921, defined the practice of medicine in very broad terms, providing that a person should be deemed to practice medicine who prescribed any drug, medicine or other agency for the treatment, cure or relief of any bodily injury. In Feige vs. State, 128 Ark. 465, 194 S. W. 865, a person not licensed to practice medicine treated paralysis by means of fasting and a water cure. The patient died. It was held that the defendant would be guilty of manslaughter if he treated the defendant

with culpable negligence, the court stating: "Appellant was at least entitled to an instruction defining the difference between a felonious lack of knowledge and skill, on the one hand, and a mere mistake of judgment, on the other. In other words, the jury should not have been left in a position to confuse a mistake of judgment with gross ignorance or lack of skill." The court also apparently disapproved of the prosecuting attorney having mentioned that the defendant in the case was not licensed to practice medicine. In that case, curiously enough, the defendant was indicted for the commission of a lawful act without due caution and circumspection. In Silver vs. State, 13 Ga. App. 722, 79 S. E. 919, it appears that the statute forbade giving morphine to anyone without prescription from a physician. Defendant, not a physician, gave morphine to another without such prescription, killing the latter. He was held guilty of manslaughter for killing while engaged in an unlawful act. The case differs from the others in that defendant did not attempt to cure any human ailment except to satisfy the appetite for the drug. In Thiede vs. State, 106 Neb. 48, 182 N. W. 570, the case was construed as holding that the act was accompanied by reckless disregard of the safety of others, and a similar unlawful act was held not to be sufficient for conviction for involuntary manslaughter, unless accompanied by negligence. See also People vs. Pavlic, 227 Mich. 562, 199 N. W. 373, 35 A. L. R. 741; 26 Am. Jur. 292, Sec. 203.

Counsel for defendant, in claiming that the requested instruction above set out should have been given, has not based his argument on the foregoing authorities, and we have been left in the dark as to what his theory is. The argument of the State appears to be somewhat equivocal. Hence it would be improper, until full investigation has been had and full argument has been made, to determine the applicability herein of any or all

of the foregoing authorities hereinabove reviewed, and we shall merely determine as to whether or not the foregoing requested instruction should have been given as asked. Counsel for the defendant has not cited us to any authorities, and we agree with the argument of the State that the requested instruction would have been misleading.

It is true that defendant was not prosecuted for practicing medicine without a license. But that would not absolve him from being guilty of a higher crime under the proper facts. If he practiced medicine without a license, and death to his patient ensued as the proximate cause thereof, he would be guilty of manslaughter, at least if his treatment was with criminal negligence. If nothing else, at least that phase of the case is entirely ignored in the requested instruction. Taking the instruction as a whole, the jury might have obtained the impression that it was not improper for defendant to engage in the practice of medicine and that to do so should have no influence in the case. We have already heretofore in point V of this opinion found that to be incorrect. It is argued, however, that the court should have modified the instruction, if deemed incorrect, and should have given it as so modified. Counsel, in his argument on this point and other points, has misconceived the extent of the duty of the court in giving instructions. It is generally held that it is the duty of the court in a criminal case to instruct the jury on the general principles applicable in the case. 23 C. J. S. 943; Gardner vs. State, 27 Wyo. 316, 330, 196 Pac. 750. See Sec. 10-1301, Wyo. Comp. Statutes of 1945, and cases cited in the annotation thereto. But particular instructions must generally be requested. 23 C. J. S. 944, 955 to 956; Brantley vs. State, 9 Wyo. 102, 61 Pac. 139; Long vs. State, 15 Wyo. 262, 88 Pac. 617. And unless such requested instruction is correct it is proper for the court to refuse to give it. 23 C. J. S. 993;

Smith vs. State, 17 Wyo. 481, 101 Pac. 847. We think that the one here involved belongs to the category of particular instructions, and being misleading, the court properly refused to give it.

*VII.   Sufficiency of evidence to convict.*

It is contended that the evidence in this case was insufficient to justify the conviction herein. It is argued by counsel for the defendant that, in view of the fact that the physicions testifying for the State did not know the amount of a lethal dose of sodium pentothal, and that most of them had never witnessed a death resulting from the administration of the drug, the cause of the death was wholly conjectural, particularly in view of the testimony for the defendant. It is perhaps true that there is an element of conjecture in the case, but most things in life cannot be proven with absolute mathematical certainty. The competency of the witnesses for the State was not questioned and the weight of their testimony was for the jury.

It is true, as pointed out by counsel for the defendant, that a number of contradictions appear in the record. Thus Dr. Teal testified that in his opinion death occurred before the shoulder was set. That must have been very shortly after the administration of sodium pentothal. We do not know whether or not this theory is correct, but it does not appear to be in harmony with the facts in the case or with the testimony of the other physicians, Dr. Morgan stating that, in his opinion, a lethal dose is about 1.4 gram of a 5% solution or between 9 to 10 times greater than that apparently assumed to be a lethal dose by Dr. Teal. The testimony is also irreconcilable on the question of the effect of the rapidity of injection of the drug. So the testimony of Dr. Harris, that the effect of sodium pentothal is graduating, hardly seems consistent with the testimony of Dr. McShane and other physicians that

the drug is rapidly eliminated in the blood stream. And other contradictions appear in the record. The testimony as a whole, however, presents a situation somewhat different than what counsel for the defendant seems to assume. Doctors Phelps, McShane and Harris, did not testify that 15/100ths of a gram of the drug is in and of itself lethal, but that it was lethal in this case in conjunction with the fact that Paris did not get enough air and that counterstimulants such as oxygen, metrazol or other stimulants were not used. In fact the emphasis of their testimony appears to be placed on the latter fact. They further took into consideration that, in their opinion, no cause of death other than from the administration of sodium pentothal appeared in the case. Their theory seems to be that rapid injection of the sodium pentothal had a depressing effect on the respiratory center of the brain, which was sufficient in this case so as to require artificial oxygen or other counter-stimulants to keep respiration going. If the testimony of Miss Duncan and the defendant is true that the cyanotic condition of the deceased improved after 5:15 P. M. when blankets were put on him, it is not unreasonable to infer that his life could have been saved even then, if the proper counter-stimulants had then been administered. Dr. Morgan, who testified on behalf of the defendant, did not deny as far as we can find that the administration of the drug in question here had a depressing effect on the respiratory center in the brain. We do not think that the absence of such effect may be gathered from his testimony as to what constitutes a lethal dose. He admitted that at least as a precautionary requirement circulatory stimulants should be on hand. That indicates at least that the administration of the drug may have had an adverse effect on circulation, and hence on the respiratory center of the brain which controls res-

piration. See Volume 19, Enc. Britannica, 14th Ed., P. 218, 221; Martin, Human Body, 363 to 369.

One of the most vital points in the case seems to be the time when Joe Paris first became cyanotic, Dorothy Duncan and the defendant testifying that that first appeared at 5:15 P. M., and that up to that time the patient's breathing was normal and his pulse was normal. In the hypothetical question put to the physicians testifying for the State that was assumed to be true although it was also assumed that the head of the patient rested on a pillow. A great deal of the argument of counsel for the defendant is based on the literal truth of the foregoing testimony, and Dr. Stein, also accepting that as one of his premises, reasoned thus, and apparently logically: Sodium pentothal does not affect anything except the respiratory tract; the effect of the drug was completely destroyed within 3 or 5 or 8 minutes; the evidence shows that the patient at no time stopped breathing until 5:15 P. M.; hence, he was unable to see how sodium pentothal had anything to do with the death of Joe Paris. Part of the reasoning of Dr. Phelps was similar, if not identical, for he testified "if oxygen reached his lungs and he became cyanotic thirty minutes after the administration had stopped, and he was breathing, and death resulted, I would give the reason for death as from something other than sodium pentothal." Hence, his opinion and perhaps that of the others, that the drug was the cause of the death, implies that he rejected part of the premises upon which the opinion of Dr. Stein was based, and is essentially based on a direct contradiction of the testimony of Miss Duncan and the defendant that the patient breathed normally and had sufficient oxygen until 5:15 P. M. The important question then arises as to whether or not the jury were justified in disregarding the foregoing testimony of Miss Duncan and the defendant. We think that we cannot say that they were not. They

were the judges of the credibility of the witnesses. Joe Paris was a man of swarthy complexion, making it more difficult to tell any oncoming cyanosis. The jury were not bound to believe that Miss Duncan and the defendant gave as close attention to the patient as they testified. Mr. Wingo stated that when he saw the patient at 6:00 P. M. his head was resting on a pillow. The defendant, too, had testified at the coroner's inquest that the head of Joe Paris was resting on a pillow. Dr. Phelps and Dr. Harris both testified positively that to rest the head of a patient on a pillow under the circumstances was wrong and would cause the air passage to become obstructed. Dr. Phelps stated: "In this case the simple thing that undoubtedly caused most of the trouble was the fact that this man had a pillow under his head." That is aside from the testimony that the effect of sodium pentothal is depressing. We think the question was one for the jury to solve. Furthermore, as already indicated, there is considerable testimony in the record that nothing aside from the administration of sodium pentothal and its resulting effects could have caused the death of Joe Paris. Taking the testimony as a whole we are not able to say that it was insufficient to warrant the conviction of the defendant. To say that it was not would, we think, be a usurpation of the function of the jury.

Counsel for the defendant refers to the fact that difficulty was encountered in placing the pulmotor from the fire department into place; that it took 2 or 3 minutes to do so, and that this period was sufficient to cause the death of Joe Paris, for which the defendant would not in any way be responsible. We do not see the force of the reasoning. If the condition of Joe Paris at the time when the pulmotor was sought to be used was brought about by the negligent act of the defendant, then the fact that it took time to put the pulmotor into operation would not excuse the defendant, for in such

case the acts of the defendant contributed to a material extent to the death. When that is true the defendant is not excused. Hollywood vs. State, 19 Wyo. 493, 120 Pac. 471, 476, 122 Pac. 588, Ann. Cas. 1913 E, 218; State vs. Velsir, (Wyo.), 159 Pac. 2d 371, 377; 26 Am. Jur. 191.

*VIII.   Exclusion of testimony of attending physician.*

The defendant sought to obtain the opinion of Dr. P. V. Ketchum, who was present at the time of the death of the deceased. An objection was made as to the competency of the witness on the ground of the fact that he had not shown he was familiar with sodium pentothal. The objection was sustained and that is assigned as error herein. No offer was made as to what the witness would testify to, and the attorney general takes the position that for that reason alone the exclusion of the testimony was not error. But that rule does not apply in this case. This court has twice held that if the testimony of a witness is rejected by the court upon the sole ground of his incompetency it will be presumed that the testimony of such witness would have been material without any statement to that effect in the record and without an offer having been made of what it was expected to prove by him. McGinness vs. State, 4 Wyo. 115, 31 Pac. 978; Owens, Sheriff, vs. Frank, 6 Wyo. 457, 53 Pac. 282. In the case of Hollister vs. Smith & Reznor, 9 Ohio State, 1, 9, cited with approval in the McGinness case, the court said: "In other words, where the witness offered is rejected as incompetent to testify, the court will hold that the party offering the witness has been prejudiced by his exclusion, though the facts he was expected to prove are not stated, the ground of exclusion being one wholly irrespective of the subject matter of his testimony." It is true that the qualification of a witness to testify as an expert is to some extent within the discretion of the

trial court, nevertheless, its ruling is not final, and the determinative test is as to whether or not the witness is in fact competent under the rules of law. Valdez vs. Percy, 35 Calif. App. 2d 485, 96 Pac. 2d 142, 145; Pridgen vs. Gibson, 194 N. C. 289, 139 S. E. 443.

Dr. Ketchum is a physician and surgeon and was at the trial of this case director of the Laramie County Health Unit. He is a graduate of Ft. Wayne, Indiana Medical School, affiliate of the University of Indiana, and he is licensed to practice medicine and surgery in Indiana, Iowa, Wyoming and Colorado. He had been engaged in the practice of medicine for 42 years. He was the only physician and surgeon present at the time when Joe Paris died. He arrived at the office of the defendant, after he had been called, about 6:00 P. M. in the evening of October 6, 1945, where he saw the deceased. When the Doctor arrived the deceased was desperately ill, was cyanotic, was not breathing and apparently dead. The witness examined his heart at that time and found it beating; he also examined his respiration and pulse, but was unable to get a pulse. He used a stethoscope on the chest and immediately turned him over on his belly and started artificial respiration. He checked his heart beat about three times. He checked it ten minutes after artificial respiration had been checked and it was still beating. The last time he checked the heart was following the use of the pulmotor; it was several minutes after that when he could hear no heart beat. This was approximately at 6:25 P. M. When the witness administered artificial respiration he was able to maintain an open air passage with difficulty, but it was open. He was not able to get air with the aid of artificial respiration, but the patient was able to take air by means of manual artificial respiration after the Doctor's arrival until the pulmotor arrived. The defendant at that time gave him the history of the case; told him that the deceased had had a dislocat-

ed shoulder which had not been reduced; that the deceased came into defendant's office suffering great pain and asked for relief, and he also told the Doctor that he administered 3 cc's of a 5% solution of 15/100th of a gram of sodium pentothal as an anesthetic. The witness was then asked: "Doctor, during the course of your practice of 40 years have you observed a patient in the same condition as this man when you went to the office that afternoon? A. Very similar. Q. On how many occasions? A. A great many." He was then asked whether he had any opinion from the history of the case that had been given him and from what he observed that afternoon, the condition of the patient and the treatment of him, as to the cause of the death of the deceased. His testimony was excluded under objection as already previously stated.

The competency of Dr. Ketchum as an expert should not, of course, be judged by a severer rule than the competency of those upon whose testimony the defendant was convicted and whose knowledge, too, was limited to a certain extent by reason of the fact that they had never observed a man die from the administration of sodium pentothal, and who did not know the minimum dose of sodium pentothal which would be lethal. In Siebert et al. vs. The People, 143 Ill. 571, 32 N. E. 431, a physician was held competent to testify to the cause of death by poison, although it had not been shown that he had had any experience in a case of poisoning. In Langeneckert vs. St. Louis Sulphur & Chemical Co., (Mo. App.), 65 S. W. 2d 648, a physician had never had any experience with sulphur dust, nor had he read about it. Nevertheless, he was held competent to testify to the effect of such dust upon a human being. In Robinson vs. Marino, 3 Wash. 434, 28 Pac. 752, the court said: "Physicians and surgeons of experience are presumed to be acquainted with all matters pertaining to their profession, and to be competent to testify con-

cerning the same." To the same effect is Miller vs. State, 94 Ark. 538, 544, 128 S. W. 353; State vs. Kammel, 23 S. D. 465, 122 N. W. 420; Von Pollnitz vs. State, 92 Ga. 16, 18 S. E. 301, 44 Am. St. Rep. 72. In Kelly vs. United States, 27 Fed. 616, the court said: "Dr. Fuller testifies that he was a physician and surgeon, a graduate of Bowdoin Medical College in 1873, and that since graduation he had been in practice at Bath, Maine. We think Dr. Fuller, by reason of his general professional studies and experience, was a qualified expert, without showing any special study or experience on his part of gunshot wounds." In Pridgen vs. Gibson, supra, the court said: "If a regular and continuous practice in his profession for 30 years does not entitle the witness to be regarded as an expert or experienced physician, it is difficult to conceive what would do so." In the case at bar the witness had had 42 years of experience as a practicing physician and surgeon. In 32 C. J. S. 262, it is stated: "As a general rule, any practicing or duly qualified physician or surgeon is competent to state his inference or judgment, * * *. It is not essential that the witness should ever have treated the disease or injury in question, or should have been confronted, in his practice, with a situation exactly like that which was the subject of the litigation; neither is it necessary that he be familiar with the method of treatment employed in the particular case, that being a matter going to the weight, rather than to the competency, of the testimony." It appears from other medical testimony that it is important in determining the cause of a death to be present at the time thereof. Several witnesses had testified that respiratory failure could mean that death was due to any number of causes. Dr. Ketchum was present, and the only physician who was present, at the time of the death of Joe Paris; he observed the symptoms of the deceased, and worked over him. He testified that he had seen a great many cases similar to

the one then confronting him. It may be that in his opinion the type of anesthetic administered or the administration of any anesthetics at all had nothing whatever to do with the death of the deceased. It would seem that to have observed a great many similar cases to that in question should count for something. We think that the ruling of the court was prejudicial error.

*IX. Exclusion of testimony as to number of deaths observed.*

The following questions propounded to the witness, Dr. Morgan, and his answers thereto were not permitted to be introduced in evidence. These were as follows: "Q. Have you ever had occasion to observe the death of human beings when, in your opinion, it was caused as the result of pentothal sodium? Yes. Q. On how many occasion was this? A. About 5 when I was administering the anesthetic and about 30 others to which I was called in to assist. Q. In the cases which you have observed, Doctor, where a death was due to pentothal sodium, was breathing ever restored after it had once stopped? A. No." The last question and answer may possibly have been in answer to the testimony of Dr. Teal, but counsel for the defendant does not seem to make any such claim, so that we shall pretermit any further reference thereto. The State claims in its brief that the remainder of the testimony was rightly rejected because no similarity of conditions had been shown, citing 32 C. J. S. 438. But in one respect at least there was shown not only a similarity but almost complete identity, namely, death as the result of the administration of sodium pentothal. According to the testimony of Dr. Stein and Dr. Morgan, age makes little, if any, difference in connection with the administration of this drug, it appearing that it had been administered to a child as young as six months and to a man as old as ninety-four years, so the show-

ing of similarity in that respect would hardly be required. The testimony for the State shows the death of Joe Paris to have been the result of administration of 15/100ths of a gram of the drug. That, it is true, was not shown to have been so in the 35 cases of death which Dr. Morgan had witnessed, but he had testified that that amount of the drug had nothing whatever to do with the death of Joe Paris; that it takes about 1.4 gram to be lethal. Taking that testimony into consideration, along with the testimony now in question it would mean that in his experience the 35 deaths were caused and could have been caused only by the administration of about 1.4 gram of the drug, and they were not and could not have been caused by the administration of 15/100ths of a gram. The admission of the testimony could not possibly have been error, for it would at least have shown a greater competency of Dr. Morgan as an expert witness, and it is always proper to permit an expert witness to state the extent of his experience. Nordan vs. State, 143 Ala. 13, 39 So. 406. It is true Dr. Morgan had already testified to his large experience with sodium pentothal, but knowledge of the cause of death from the administration thereof was of peculiar and special importance in this case. The testimony also would have been clearly admissible on cross-examination. We see no reason why it should not have been permitted on direct examination. The jury were in search of the truth. The method of that search, if not unfair, is, after all, but a secondary matter. See Lewiston Steam-Mill Co. vs. Androscoggin Water-Power Co., 78 Me. 274, 4 Atl. 555. The testimony sought to be elicited was in the nature of giving the basis or reason for the opinion of Dr. Morgan, that the sodium pentothal administered to Joe Paris had nothing to do with his death, and the reason or basis for the opinion of an expert is always admissible. Rogers on Expert Testimony, 3d Ed., P. 81; 32 C. J. S. 219. The testi-

mony should have been admitted, although we are not prepared to hold that the judgment herein should be reversed for that error alone.

### X. Defining criminal negligence.

The defendant asked the court to give to the jury the following instruction: "You are instructed that before you can convict the defendant on the charge of culpable neglect or criminal negligence, if any, resulting in the death of Joe Paris, the carelessness must have been gross, implying an indifference to consequences; and the term culpable neglect means something more than mere negligence. It means wantonness and disregard of the rights of others that is equivalent to a criminal intent." The court refused to give this instruction. An error is predicated upon that refusal. No similar instruction was given by the court.

The defendant was charged with killing the deceased in the commission of an unlawful act or by criminal negligence. The case was submitted to the jury on that theory by several instructions. The physicians who testified on behalf of the State insisted strongly that the defendant was guilty of negligence in giving the sodium pentothal to the deceased. It is not improbable that the jury adopted that theory in convicting the defendant. In any event, the question of criminal negligence was an issue in the case. The charge in the information following the term "to-wit" is, we take it, descriptive matter, which must be proven. 31 C. J. 837, Sec. 445; 42 C. J. S. 1266-1267, Sec. 250. Hence the State was required to prove criminal negligence, but it was not required to prove any other unlawful act, especially in view of the disjunctive contained in the first part of the information. It became important then to the defendant that the jury should be informed that culpable negligence and criminal carelessness is much more than ordinary negligence. That that is

true is established by overwhelming authority. State vs. McComb, supra; 26 Am. Jur. 299; 29 C. J. 1154; 40 C. J. S. 925, 926; State vs. McMahan, 57 Idaho 240; 65 Pac. 2d 156, and numerous cases cited; Smith vs. State, 197 Miss. 802, 20 So. 2d 701. Thus in 40 C. J. S. 926, it is said that "it is ordinarily required that the negligence on which involuntary manslaughter may be based must be of a gross or flagrant character, such as would show wantonness or recklessness, or would evince a reckless disregard of human life or the safety of others, or indifference to consequences, equivalent to criminal intent." That the defendant was entitled to the instruction asked, or the equivalent thereof is shown by Feige vs. State, supra. So in State vs. Bates, 65 S. D. 105; 271 N. W. 765, the case was reversed for refusal of the court to give a requested instruction defining the term culpable negligence. In that case the court seems to have gone farther than other courts in the degree of negligence required, stating that the defendant must intentionally do the act complained of so "that it can be said that he consciously realized that his conduct would in all probability (as distinguished from possibly) produce the precise result which it did produce." In People vs. Driggs, 111 Cal. App. 42, 295 Pac. 51, the court said: "When the court attempted to instruct the jury on the subject of negligence, the instruction should have been so framed as to advise the jury as to the kind of negligence characterized as 'criminal' by section 20 of the Penal Code." The main contention of the State in its brief herein in this connection seems to be that the instruction asked to be given by the court was incorrect, and that accordingly, the court was justified in refusing to give it. It has not been pointed out in what respect it is incorrect. It is true that courts have found difficulty in defining criminal negligence, and have not always defined it in the same terms. See Moreland, A Rationale of Criminal

Negligence, Chapter 6; Hall, Principles of Criminal Law, 225-235. In the case of People vs. Barnes, 182 Mich. 179, 198, 148 N. W. 400, the court stated: "The crime sought to be proven was involuntary homicide, caused by culpable negligence, and, to make an act carelessly performed resulting in death a criminal one, the carelessness must have been gross, implying an indifference to consequences; and the term 'gross negligence' means something more than mere negligence. It means wantonness and disregard of the consequences which may ensue, and indifference to the rights of others that is equivalent to a criminal intent." Similar in effect is Minardo vs. State, 204 Ind. 422, 183 N. E. 548; Walter vs. State, (Fla.) 26 So. 2d 821; 40 C. J. S. 925. The instruction asked is substantially in the language of the statement from the Michigan court just quoted, and was probably taken from the quotation as set out in State vs. McComb, supra. We do not say that an instruction defining criminal negligence should be exactly in the words in which it was asked in this case, but the instruction asked was substantially correct and should have been given.

Other but minor points are argued without citing us to any authorities. We do not now think them to present questions of prejudicial error and it is not necessary to discuss them, as they may not arise again in another trial.

For the errors herein pointed out, the judgment of the trial court is reversed, and the cause is remanded for a new trial.

RINER, C. J., and KIMBALL, J., concur.